## Commonwealth vs. Deborah Robinson.

No. 08-P-810.

Suffolk. May 1, 2009. - August 3, 2009.

Present: Kantrowitz, McHugh, & Meade, JJ.

*Wanton or Reckless Conduct. Practice, Criminal,* Instructions to jury, Argument by prosecutor. *Minor,* Medical treatment.

The evidence at a criminal trial was more than sufficient to permit a rational trier of fact to conclude that the defendant's wanton or reckless delay in seeking medical care for her minor daughter permitted the daughter to suffer a substantial bodily injury, in violation of G. L. c. 265, § 13J(*b*). [757-759]

At the trial of an indictment charging the defendant with wantonly and recklessly permitting substantial bodily injury to a child in her custody in violation of G. L. c. 265, § 13J(*b*), arising from the defendant's failure to seek medical care for her minor daughter, the judge did not err in failing to include, in his instruction to the jury on wanton and reckless conduct, an instruction that the jury could consider the defendant's and her daughter's constitutional right to refuse medical treatment, where the defendant offered no evidence or argument to suggest that her inaction was based on her right to refuse medical treatment for her daughter, and where the record did not permit a conclusion that the daughter herself either was qualified to make a decision to forgo medical care or did in fact make an informed decision to decline such care with full knowledge of the circumstances. [759-763]

At the trial of an indictment charging the defendant with wantonly and recklessly permitting substantial bodily injury to a child in her custody in violation of G. L. c. 265, § 13J(*b*), arising from the defendant's failure to seek medical care for her minor daughter, certain statements in the prosecutor's closing argument, read in context, were consistent with the elements of the statute and did not overstate the defendant's duty to seek medical care for her daughter. [763-765]

Indictment found and returned in the Superior Court Department on September 29, 2005.

The case was tried before *Ralph D. Gants*, J.

*Jason Benzaken* for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

MEADE, J. The defendant was convicted of wantonly and recklessly permitting substantial bodily injury to a child in her custody in violation of G. L. c. 265, § 13J(b), inserted by St. 1993, c. 340, § 2. On appeal, she claims that there was insufficient evidence to support her conviction, and that the judge's instruction on wanton and reckless conduct and the prosecutor's closing argument created a substantial risk of a miscarriage of justice. We affirm.

1. *Background.* a. *The 911 call.* On August 3, 2005, at approximately 3:00 A.M., the defendant called 911 from a pay phone to report that her thirteen year old daughter, Allison,[1] was unconscious. In response, emergency medical technicians (EMTs) Donald Efstathiou and his partner, Estelle Cournoyer, were dispatched to the defendant's home in the Hyde Park section of Boston. The defendant's fifteen year old son let the EMTs into the apartment where they found Allison lying on her back on the living room couch. Allison, who was wearing a diaper, appeared to Efstathiou to be "very, very sick," "very malnourished," and "emaciated." Her eyes were sunken, her ribs were visible through her skin, and her breathing was abnormally fast. Efstathiou was unable to measure her blood pressure, which indicated that she was extremely dehydrated. Neither verbal nor painful stimuli succeeded in rousing her; she was unresponsive.

While the EMTs were still at her apartment, the defendant returned from having made the 911 call. The defendant told the EMTs that Allison did not have any previous medical history. She did note that Allison had been complaining of "some abdominal discomfort" for a few weeks and that she had been losing a lot of weight. When Efstathiou and Cournoyer lifted Allison off the couch to put her on a stretcher, Efstathiou realized that she "had no muscle tone at all." Her bones were so exposed that he feared that they would injure her by lifting her.

As the EMTs brought Allison out of the apartment building, paramedic Len Shubitowski arrived. Once inside the ambulance, Shubitowski saw that Allison's eyes were open but unfocused, she was not "interacting with the environment," and she was making "unintelligible moans." Her breathing was fast, nearly

---

[1]A pseudonym.

three times the rate of an average person her age, and her pulse was rapid and faint. She had an open circular lesion on her abdomen, immediately below her navel, from which a foul-smelling brown substance was oozing. Shubitowski noticed that the muscle tissue between her ribs was sunken, which indicated she was "grossly underweight." It was obvious to Shubitowski that Allison had not eaten enough food for some time, and that it would have taken "a matter of weeks" for a healthy adolescent girl to become so emaciated.

b. *Allison's condition.* The defendant, who accompanied Efstathiou in the ambulance that brought Allison to the hospital, told him that over the previous few weeks Allison had been experiencing some swelling in her belly and drainage from the area of her navel. During that same time period, Allison's appetite had become poor and she lost a lot of weight. She eventually became so weak that she was no longer able to walk up the stairs to use the bathroom. After she had an "accident," the defendant managed her incontinence with adult diapers and a bucket she placed next to the couch to prevent any recurrence.

Soon after Allison was admitted to the hospital, Lisa Allee, a clinical social worker, was called into the pediatric intensive care unit (ICU) to observe Allison. Allee, who had experience with malnourished children, had never seen a child as emaciated as Allison. Allison, who normally weighed 115 pounds, weighed only eighty-one pounds at the time of her admission to the hospital. Allison had decubitus ulcers, i.e., bed sores, on her lower back which Allee had never seen on an adolescent who was not paralyzed. Allison remained in critical condition for the first month of her admission, and was kept in the pediatric ICU for over a month.

After seeing Allison, Allee interviewed the defendant to find out what had happened. Although the defendant behaved defensively during the twenty-minute interview, she did reveal that two or three weeks earlier, Allison had pierced her own navel. Since that time, her belly began to swell and discharge pus. Afterwards, Allison only wanted to lie on the couch, and her appetite decreased to the point that she was "eating very little." The defendant admitted that she had not brought her children to a doctor since they were in elementary school because "she was afraid that the doctor would do something."

Victor Price, a Department of Social Services investigator, also interviewed the defendant as part of an "emergency response" to Allison's hospital admission. When Price asked her what happened, the defendant said that "she [had done] everything she could." The defendant explained that in early July, Allison began to suffer from diarrhea that lasted for a few days before the navel area of her abdomen began to swell, which increased and decreased over time. The defendant attributed these symptoms to the fact that Allison's navel had been pierced about two or three weeks earlier. During this same time period, pus began leaking out of Allison's navel, and ultimately she stopped eating solid foods.[2] The defendant continued to give her liquids and "noodles." Despite these symptoms, the defendant did not seek medical assistance until the 911 call because "the hospital makes no promises."[3]

c. *Medical evidence.* Dr. James Borger, a pediatric surgeon, treated Allison at the Boston Medical Center. Borger observed that Allison was "obviously very malnourished" and that there was stool and pus oozing from a wound near her navel. He confirmed the existence of bed sores on her back, which Borger thought was "very, very unusual" on a thirteen year old girl.[4] Allison was extremely dehydrated and her electrolytes were out of balance. Computed tomography scans revealed a large amount of fluid in her abdominal cavity with several abscesses, and she was suffering from pneumonia.

Surgery revealed that Allison had a large amount of pus, peritonic fluid, and stool in her abdominal cavity. Her omentum, i.e., the fatty layer the covers the bowel, was so inflamed that it had adhered to the bowel. Borger discovered three or four perfora-

---

[2]According to the defendant, Allison normally ate three meals a day as well as cookies and snacks. She knew Allison was losing weight, but the defendant said Allison was neither suffering from anorexia nervosa nor taking medication. The defendant and her son were properly nourished.

[3]Prior to the incident, Allison had been a good student, especially in reading and writing, and achieved the second highest score in her entire school on the literacy section of the Massachusetts Comprehensive Assessment System test. A teacher testified that Allison had always been thin but was also healthy and active.

[4]Bed sores are caused by staying or lying in the same position for an extended period of time, which causes pressure to be exerted in the location of the sore. Bed sores take weeks to develop.

tions of her intestines, one below her navel, and two or three in the right colon. She also had a large hole in her cecum, two small holes in the small intestine, another hole in her duodenum, and "large collections of pus everywhere." Borger opined that Allison had perforated her bowel in the course of piercing her own navel, which caused stool to leak into her abdominal cavity and caused her to develop peritonitis.[5] As time went on, more and more pus developed until her abdominal cavity became so irritated that several perforations occurred, which caused the abdominal abscesses. Allison underwent five separate surgeries to repair the holes in her abdomen, remove the fluids, and stem the infection.

For Dr. Borger, Allison was the sickest child of her age he had treated in almost thirty years who did not die. Based on her condition, he opined that the onset of her infection must have occurred weeks earlier, and that it would have taken her a similar period of time to lose thirty-four pounds. He also believed the infection would have caused "a significant amount of pain," and that pain would have begun within hours of the infection's onset.

Given Allison's unresponsive state when she was brought to the hospital, Borger believed that she would have died in the next few days without medical intervention. If she had been hospitalized at the onset of the infection, Allison would have still required surgery for her perforated bowel, but her course of treatment would have been shorter and she would not have been in such an "extreme condition."

d. *The defense.* The defendant's son testified that Allison became sick in early July, and she attempted convalescence on the couch. Although her belly swelled, the swelling also subsided, which led Allison's family to believe she was getting better. She remained alert and conversational and was eating solid food until August 2, when she became "out of it." She did not appear to be or complain that she was in pain, and the defendant took care of her during her illness.

Allison testified to her scholastic aptitude, and that she pierced

---

[5]Although Allison's appendix had a small hole in it, it was not inflamed, which would occur if she had appendicitis. Rather, because the inflammation was secondary, Dr. Borger believed that it was probably caused by the same infection that eroded her bowel in other areas.

her own navel in late December, 2004. She began feeling sick in late June, 2005. By the end of July, she got progressively sicker, was eating very little, and stopped eating altogether a few days before she went to the hospital. She claimed that she was not in pain and did not complain about pain to the defendant. She, like her family, believed that she was getting better when the swelling in her abdomen subsided. Allison did not believe she needed a doctor or to be hospitalized as she likened her condition to having menstrual cramps, and she was "blowing it off a little bit, even when [she] was weak." She did admit, however, that one would need a doctor when in pain and "something really bad is happening . . . inside your body."

2. *Discussion.* a. *Sufficiency of the evidence.* The defendant claims that there was insufficient evidence to support her conviction of recklessly permitting substantial bodily injury to a child in her custody. When analyzing whether the record evidence is sufficient to support a conviction, an appellate court is not required to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Velasquez,* 48 Mass. App. Ct. 147, 152 (1999), quoting from *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979). See *Commonwealth* v. *Hartnett,* 72 Mass. App. Ct. 467, 475 (2008). Rather, the relevant "question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia, supra.*

When evaluating sufficiency, the evidence must be reviewed with specific reference to the substantive elements of the offense. See *Commonwealth* v. *Latimore, supra* at 677-678. To prove a violation of G. L. c. 265, § 13J(*b*), the Commonwealth must prove beyond a reasonable doubt that (1) the defendant had care and custody of a child, (2) the child was under fourteen years of age, (3) the child suffered substantial bodily injury, and (4) the defendant wantonly or recklessly permitted the child to suffer substantial bodily injury. "Substantial bodily injury" is defined as "bodily injury which creates a permanent disfigurement, protracted loss or impairment of a function of a body member, limb or organ, or substantial risk of death." G. L. c. 265, § 13J(*a*).

The defendant makes no claim challenging the abundant evidence supporting the first two elements of § 13J(*b*). Instead, the defendant's argument is that the Commonwealth's evidence was insufficient to establish that her conduct was wanton or reckless or that her conduct caused Allison to suffer a substantial bodily injury. However, because the evidence established that a reasonable person, knowing what the defendant knew, would have realized that there was a high likelihood that Allison would suffer a substantial bodily injury if she did not receive timely medical attention, see *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944), we disagree.

In the light most favorable to the Commonwealth, the jury were entitled to conclude the following. Allison became sick in early July, 2005, and her condition became progressively worse until her hospitalization. Her appetite bordered on the nonexistent, and she was extremely dehydrated. Even though she was already thin, her weight plummeted thirty-four pounds during her illness. Medical personnel believed this would have taken weeks to occur. Allison's muscle tissue was so seriously deteriorated that a social worker, who had experience with malnourished children, characterized Allison as the most emaciated child she had ever seen.

In addition to her severe weight loss, which alone would have alerted a reasonable person that Allison was in need of medical care, see *Commonwealth* v. *Chapman*, 433 Mass. 481, 484 (2001) (malnutrition or dehydration may cause a "substantial impairment of the physical condition" for purposes of § 13J), she also exhibited extraordinary medical problems, not the least of which included the foul stench of the pus and stool that were oozing from the hole in her swollen abdomen below her navel. This obvious, if not flagrant, abnormality was coupled with the fact that Allison was so weak that she could no longer negotiate the stairs to the bathroom to carry out normal excretory hygiene. In fact, her incapacity was so complete that she had developed bed sores on her back, which also indicated that she had not moved for weeks. Rather than seeking immediate medical assistance for Allison in light of these startling circumstances, the defendant gave her a bucket and then diapers to prevent her from soiling the couch.

Dr. Borger opined that the level of Allison's infection would have taken weeks to develop, and that she must have been in "a significant amount of pain" throughout her illness. The jury were free to discount Allison's and her brother's accounts of a pain-free illness in favor of the medical testimony. See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting from *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978) ("To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies' ").

The defendant also claims that the evidence failed to establish that her conduct caused Allison's injuries. We disagree. Wanton or reckless conduct may occur by act or omission where there is a duty to act and the failure to so act provides a "high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Welansky, supra.* See *Commonwealth* v. *Garcia*, 47 Mass. App. Ct. 419, 419-420 (1999) (§ 13J criminalizes omissions that result in child abuse). Allison was in the defendant's care and custody, and thus the defendant unquestionably had a duty to provide for her daughter's well-being. See *Commonwealth* v. *Torres*, 442 Mass. 554, 568 (2004); *Commonwealth* v. *Panagopoulos*, 60 Mass. App. Ct. 327, 329 (2004). Moreover, the fourth element of § 13J(*b*) is phrased in terms of inaction, i.e., *permitting* a child to suffer serious bodily injury. G. L. c. 265, § 13J(*b*).

Here, there was more than ample evidence that Allison's unattended infection resulted in holes in her intestines, her cecum and her duodenum, which required five surgeries to correct. In Dr. Borger's nearly thirty years of experience, Allison was the sickest child he had ever treated who did not die, but a few more days of inaction would have relieved her of that distinction. While earlier medical intervention would not have prevented all the harm that befell Allison, it would have shortened the course of her illness, prevented her from becoming so extremely sick, and diminished the pain she experienced. The evidence, when viewed as a whole, was more than sufficient to permit a rational trier of fact to conclude that the defendant's wanton or reckless delay in seeking medical care permitted Allison to suffer a substantial bodily injury.

b. *Jury instructions.* The defendant also claims that the judge

erred in his jury instruction on wanton or reckless conduct.[6] Specifically, she asserts that the judge failed to inform the jurors that, as part of their consideration of what a reasonable person would have known in similar circumstances, they should consider the defendant's and her daughter's constitutional right to refuse medical treatment. However, the defendant neither requested this instruction nor objected to its absence. See Mass. R.Crim.P. 24(b), 378 Mass. 895 (1979) ("No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict"). As such, we review this claim only to determine whether the judge's instruction created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Zimmerman*, 441 Mass. 146, 150-151 (2004); *Commonwealth* v. *Peppicelli*, 70 Mass. App. Ct. 87, 95 (2007). We discern no such risk.

The interest of a parent in the care, custody, and control of his or her child is a well recognized fundamental liberty interest. *Stanley* v. *Illinois*, 405 U.S. 645, 651 (1972). *Troxel* v. *Granville*, 530 U.S. 57, 66 (2000). See *Wisconsin* v. *Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"). Put differently, there is a "private realm of family life which the state cannot enter." *Custody of a Minor*, 375 Mass. 733, 737 (1978), quoting from *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944). However, "family autonomy is not absolute, and may be limited where, as here, 'it appears that parental decisions will jeopardize the health or safety of [a] child.' " *Custody of a Minor, supra,* quoting from *Wisconsin* v. *Yoder, supra* at 234. In fact, "[w]here

---

[6]Wanton or reckless conduct is conduct involving a grave risk of harm, undertaken by a person with indifference to or disregard of the consequences of such conduct. *Commonwealth* v. *Welansky*, 316 Mass. at 399. "[E]ven if a particular defendant is so stupid [or] so heedless . . . that in fact he did not realize the grave danger, he cannot escape the imputation of wanton or reckless conduct . . . if an ordinary normal man under the same circumstances would have realized the gravity of the danger." *Id.* at 398-399. Thus, under *Welansky*, "[c]onduct which a reasonable person, in similar circumstances, would recognize as reckless will suffice." *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990).

necessary to protect a child's well-being, the Commonwealth may intervene, over the parents' objections, to assure that needed services are provided." *Commonwealth* v. *Twitchell*, 416 Mass. 114, 117 (1993). See *Matter of McCauley*, 409 Mass. 134, 137 (1991). Such needed services include the medical treatment necessary to prevent a child from suffering substantial bodily injury or death. See *Custody of a Minor*, *supra* at 750 (two year old child required to undergo chemotherapy over parents' objection); *Matter of McCauley*, *supra* at 134-139 (court order that critically ill eight year old child with leukemia receive a blood transfusion was proper despite parents' objections on religious grounds); *Commonwealth* v. *Twitchell*, *supra* at 120-122 (despite religious objection, parents have a duty to seek medical care for two year old child with obstructed bowel, violation of which, if wanton or reckless, could result in conviction of manslaughter).

In the present case, the defendant did not dispute at trial that Allison's perforated intestines and her infection posed a high likelihood of substantial bodily injury.[7] Rather, she contested whether, under the circumstances, she should have acted more diligently in obtaining emergency medical assistance for Allison. Along this line, the judge properly instructed the jury on the subjective and objective components of wanton and reckless conduct. See *Welansky*, *supra* at 398-399; *Commonwealth* v. *Catalina*, 407 Mass. 779, 789 (1990).[8] In particular, the judge instructed the jury that the defendant could not be convicted unless she disregarded or failed to recognize that Allison needed prompt medical care to prevent substantial bodily injury or, alternatively, unless a reasonable person knowing what the defendant knew at the time would have recognized that there was a high likelihood that Allison would suffer substantial bodily injury if she did not receive prompt medical attention.

There was no evidence offered, nor argument made, which suggested that the reason for the defendant's inaction was based on her right to refuse medical treatment for her daughter. Even if there had been, given the near-death nature of Allison's condition and her urgent need for medical attention to protect her

---

[7] The defendant did suggest in her closing argument that Allison's condition was not caused by the botched piercing but instead was the result of appendicitis.

[8] See note 6, *supra.*

well-being, the Commonwealth would have been permitted to intervene, over the defendant's objection, to assure that needed services were provided. See *Custody of a Minor, supra*; *Commonwealth* v. *Twitchell, supra*. Given the lack of evidence to support the late-blooming claim, as well as the restricted nature of the right to refuse medical treatment (even in a religious context that is not presented here), we fail to see any error in the judge's instructions, let alone a substantial risk of a miscarriage of justice.[9]

There is similarly no merit to the defendant's claim that the judge's wanton and reckless conduct instruction was infirm because it failed to take into account that Allison was qualified to, and did herself, decide to forgo medical care. Here, again, the defendant did not request an instruction to this effect, and the evidence would not have supported it if she had.

Whether Allison was qualified to make a life-or-death decision depended upon, among other things, her maturity and whether she was properly informed of the consequences of forgoing medical care. See *Matter of Rena*, 46 Mass. App. Ct. 335, 337 (1999). The record does not permit us to conclude that Allison was mature or informed. In certain contexts, as the defendant properly maintains, a mature minor may be entitled to make informed medical decisions. See *Baird* v. *Attorney Gen.*, 371 Mass. 741, 754-755 (1977). But the defendant has failed to bring to our attention any authority to support the notion that a thirteen year old child may legally be deemed "mature." Contrast 110 Code Mass. Regs. § 2.00 (2008) (Department of Children and Families regulations state that "[a] child who is 14 years old or older is presumed to be a mature child").

The defendant's counterargument is that Allison was an excellent student, who did exceptionally well on her Massachusetts Comprehensive Assessment System exam, and should therefore be permitted to make such an important decision. But maturity is more than intelligence, and a proper evaluation of maturity

---

[9]The defendant's reliance on *Belchertown State School* v. *Saikewicz*, 373 Mass. 728 (1977), is misplaced. Saikewicz was a profoundly mentally disabled man who was unable to comprehend the benefit of chemotherapy treatment (that would not cure him), but who would experience the pain and fear attendant to it. *Id.* at 731-732, 754. Here, there is no basis in the record to conclude that Allison did not understand that medical treatment would, and did, save her life.

would require consideration of many additional factors which we need not catalog because no evaluation was made here at all. In contrast, and despite Allison's intelligence, the record discloses deficits in her judgment that are not atypical of adolescents. Indeed, her decision to pierce her own navel and to "blow[] off" the severity of her deteriorating condition are choices that do not equate soundly with maturity.

With that said, we need not decide whether Allison was "mature" because even if she were, there was no evidence that she made an informed decision to decline medical care with full knowledge of the consequences. To the contrary, the evidence showed that she had no medical information related to, or appreciation for, the critical nature of her condition. In fact, she admitted that if something were seriously wrong "inside [her] body" she would need to see a doctor. In light of the evidence of the dire nature of Allison's condition, and the obvious symptoms of something catastrophic occurring in her body, we cannot conclude that Allison made an informed choice about refusing medical treatment. Without a basis in the record for the instructions the defendant suggests, we cannot say the judge committed an error, let alone created a substantial risk of a miscarriage of justice, by not providing them to the jury sua sponte. See *Commonwealth* v. *Monico*, 373 Mass. 298, 299 (1977) ("a defendant is not entitled to a charge on a hypothesis which is not supported by the evidence").

c. *Closing argument.* Finally, the defendant claims, for the first time on appeal, that the prosecutor's closing argument overstated the defendant's duty to seek medical care for Allison. Because there was no objection, our review is limited to whether there was error and, if so, whether it created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Bonds*, 445 Mass. 821, 836 (2006); *Commonwealth* v. *Duncan*, 71 Mass. App. Ct. 150, 158 (2008). Specifically, the defendant claims the prosecutor's argument misstated the law by asserting the defendant had a duty to seek medical care for Allison based on the various factors that would have indicated to a reasonable person that she was dangerously ill. The portions of the argument sounding the challenged theme are as follows:

"We all know that teenagers will lie on the couch for a

long time watching television; but when you are ordinarily a healthy, active, 13-year-old, essentially confined to the couch for a period of at least two or three weeks, that is the time to call the doctor. It is required, it's not optional."

. . .

"[W]hen your ordinarily healthy, active, 13-year-old child has swelling, maybe twice, [over] a period of several weeks in her belly, a call to the doctor is not optional. A hospital visit [is] not at your discretion. It is mandatory."

. . .

"You heard Dr. Borger tell you, ladies and gentlemen, that that degree of weight loss can't happen in hours or days, it happens over a period of weeks. When you are watching that happen to your own daughter a call to the doctor is not optional, it's not a choice that you make, it's required. A hospital visit is a necessary step."

. . .

"[A]t some point pus began oozing . . . from a perfectly circular, roughly one-centimeter hole beneath her belly button. When that begins to happen, when you have a brown, foul[] smelling ooze, that you now know from Dr. Borger was a combination of bodily fluid and feces, a call to the doctor is not optional. The law does not permit a parent to simply say: Well, maybe she's getting better because the pus is oozing out through a hole beneath her belly button, so I think it's okay."

. . .

"At the point at which one is diapering a 13-year-old child who doesn't have a preexisting medical condition that would require diapers . . . a call to the doctor is not an option, it is not a choice, it is required."

When the challenged remarks are read in context of the entire argument, the evidence adduced at trial, and the judge's instruc-

tions, the argument properly conforms to the crime alleged by the Commonwealth. The argument was consistent with the elements of G. L. c. 265, § 13J, which criminalizes a custodian's failure to recognize a need for medical attention that would have been plain to a reasonable person in the same circumstances. It was entirely proper for the prosecutor to use Allison's specific symptoms to illustrate the obvious nature of her illness and the defendant's wanton or reckless disregard of her duty to protect her daughter's well-being. See *Commonwealth* v. *Wilson,* 427 Mass. 336, 350 (1998) ("A prosecutor is entitled to argue forcefully for the defendant's conviction"). It is also appropriate for the Commonwealth to "attempt to assist the jury in their task of analyzing, evaluating, and applying evidence. Such assistance includes suggestions by counsel as to what conclusions the jury should draw from the evidence. Counsel may 'fit all the pieces of evidence together so that they form a comprehensive and comprehensible picture for the jury.' " *Commonwealth* v. *Corriveau,* 396 Mass. 319, 336 (1985), quoting from *Commonwealth* v. *Ferreira,* 381 Mass. 306, 316 (1980). See *Commonwealth* v. *Burgess,* 450 Mass. 422, 437 (2008). As the argument was not a misstatement of the law, it was proper, and thus, there was no risk that justice miscarried.[10]

*Judgment affirmed.*

---

[10]Given the absence of error in the prosecutor's closing argument, we reject the defendant's assertion that it compounded the error in the jury instructions, which we similarly found not to exist.