## COMMONWEALTH *VS*. CARMEN FIGUEROA.

No. 11-P-833.

Hampden. July 13, 2012. - February 6, 2013.

Present: GRAINGER, BROWN, & SULLIVAN, JJ.

*Reckless endangerment of a child. Practice, Criminal,* Instructions to jury. *Evidence,* Medical record, Prior misconduct. *Constitutional Law,* Vagueness of statute. *Due Process of Law,* Vagueness of statute. *Witness,* Bias.

At the trial of an indictment charging the defendant with reckless endangerment of a child in violation of G. L. c. 265, § 13L, the evidence was sufficient to prove that the six month old victim had been subjected to a significant force, such as being dropped from a five-foot height, and that this fall caused the victim's skull fracture; further, the evidence was sufficient to prove that the defendant knew or should have known that there was a substantial and unjustifiable risk that the failure to obtain medical treatment for the victim could cause serious bodily injury or death, and, in the circumstances, the defendant had a duty to act; finally, the Commonwealth was required to prove only the creation of a substantial risk of injury. [257-261]

At the trial of an indictment charging the defendant with reckless endangerment of a child in violation of G. L. c. 265, § 13L, although the judge's instruction to the jury erroneously reversed the proper relationship between duty and the standard of behavior required of an individual after a duty has been established, no substantial risk of a miscarriage of justice arose, where the defendant actively asserted that she was the victim's caretaker and had safeguarded his welfare, and where defense counsel twice declared herself satisfied with the instructions [261-264]; further, the judge was not required to instruct the jury that the Commonwealth was required to prove that medical care would have actually alleviated a risk [264]; finally, there was no merit to the claim that the judge, sua sponte, should have instructed the jury that they should study one witness's testimony with particular care and that the Commonwealth had no special knowledge that that witness was telling the truth [264-265].

At a criminal trial, no substantial risk of a miscarriage of justice arose from the admission in evidence of two statements contained in redacted medical records, where the notations were brief and lacking in detail, and where the jury were clearly focused on the elements of the charged offenses and not any prior misconduct, as evidence by their questions and by their acquittal of the defendant on one charge and of the codefendant on four charges. [265]

This court declined to consider the criminal defendant's claim that G. L. c. 265, § 13L, the reckless endangerment of a child statute, was unconstitutionally vague as applied to the circumstances of her case. [265-266]

INDICTMENT found and returned in the Superior Court Department on December 30, 2008.

The case was tried before *C. Brian McDonald,* J.

*Mary H. Patryn* for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

BROWN, J. After a joint trial in Superior Court, a jury convicted the defendant of reckless endangerment of a child in violation of G. L. c. 265, § 13L, and sentenced her to a two-year term of probation.[1] On appeal, the defendant argues that (1) the evidence was insufficient to sustain her conviction; (2) the jury instructions were flawed; (3) medical records admitted at trial improperly included prior bad act evidence; and (4) the statute under which she was convicted is unconstitutionally vague as applied to the circumstances of her case.

At trial there was no dispute that the six month old victim suffered a complex skull fracture and multiple other injuries to his head and eyes as the result of physical abuse. The charges against the defendant stem from her failure to obtain medical care for the victim (her grandson) after he was dropped on a tile floor and struck his head. We summarize the evidence at trial in the light most favorable to the Commonwealth, focusing on evidence relevant to the defendant's attack on the sufficiency of the Commonwealth's case and reserving certain details for our discussion.

1. *Background.* The victim and his twin brother were born on August 28, 2007, to the defendant's daughter, Mary.[2] Mary was fourteen years old when she became pregnant. About six months before Mary gave birth, she returned to Chicopee from out-of-State to live with the defendant. Also living in the home were the defendant's boyfriend, the codefendant, Raphael Cruz; Mary's younger brother; and Mary's five year old niece.

When the twins were born, the defendant named one child Thad, and the codefendant named the other David.[3,4] The defend-

---

[1] The codefendant, Raphael Cruz, was convicted of assault and battery of a child with bodily injury, and assault and battery.

[2] A pseudonym.

[3] Also pseudonyms.

[4] The defendant obtained guardianship of the twins when they were born, but in February, 2008, legal custody returned to Mary. The record does not specify any reason for the changes in custody.

ant made almost all of Mary's decisions involving her life, including "all the choices" about care giving arrangements for the twins. In addition, according to Mary's testimony, the defendant kept Mary's "welfare" checks, except for $100 she gave to Mary each month to buy diapers and other baby-related items.

In October, 2007, Mary returned to middle school. The defendant worked Monday through Friday from about 7:00 A.M. to 4:00 P.M., and she told Mary that Cruz, who was unemployed, would be taking care of the twins when Mary was at school. Before Mary left for school each morning, she fed, bathed, and dressed the twins, and after school she would resume caring for the children. On the weekends, Mary cared for the babies with help from the defendant and Cruz.

On Christmas Eve, 2007, Mary and the defendant got into an argument, and when it appeared that blows might be exchanged, Cruz hit Mary in the face.[5] The defendant told Mary not to call the police.

Mary noticed that when Cruz interacted with the twins he "would be really rough with them — well, with [Thad] he [would] be rough"; David was his favorite. She explained that she saw him throw the babies, especially Thad, on the bed from a "high distance," and that he would call them names like "Stupid." Mary asked him not to call them names "because they are babies." She also saw Cruz slap them hard on the head with his hand. The babies would cry when that happened. Mary told Cruz not to do this, and she believed this conduct, particularly with Thad, "could hurt [him]." Cruz "always" replied that he knew what he was doing.

Over the course of the next month, Thad, the victim in this case, was taken to the hospital four times, with similar symptoms on each occasion. On the first occasion, February 10, 2008, the defendant and Mary took Thad to the emergency room the day after Cruz told them that Thad had suffered a "choking episode" and turned purple while Mary was at school. At the hospital Thad was diagnosed with asthma and sent home with medication. On or about February 19, 2008, Mary called an ambulance, and she and Thad were taken to the hospital because he had a fever

---

[5] In this joint trial, the codefendant was convicted of assault and battery on Mary.

of 103 degrees and diarrhea, and he was vomiting. Thad was given intravenous fluids and discharged with instructions to keep him hydrated.

Over the next ten days, Mary testified, Cruz "just kept on hitting [Thad] in the head and throwing him on the bed." She further testified that "most of the time" when Cruz shook Thad she saw "his head was going back and forth." Cruz would raise Thad above his head and shake him for about two to three minutes at times, because Thad would not take his bottle. Mary remembered one particular occasion when she saw Cruz shake Thad in this manner on February 25, 2008. Thad still appeared to be sick with a fever, and "wasn't acting himself."

On Friday, February 29, 2008, Mary was in the hallway when she saw Cruz with Thad in the defendant's bedroom. Cruz had been feeding the baby. She saw Cruz holding Thad and shaking him from side to side. Thad was laughing at first and then began to cry. Cruz had the baby high above his head and was shaking him when he started to cry, and then suddenly Cruz dropped Thad to the tile floor. Thad's head struck the tile, and Mary ran to pick him up. Thad "was crying a lot." Mary knew immediately that "something was wrong with him." She saw a redness on Thad's head where it had hit the tile. She was afraid, because she knew "something serious could have happened."

Within two or three minutes, the defendant emerged from the shower, and Mary told her "what she had seen happen" and urged the defendant to help her get Thad to the hospital. The defendant refused. She told Mary Thad was going to be all right, but she did not look at the infant. Rather, she immediately took Mary's cellular telephone and told her to go to her room. The defendant threatened Mary, warning her that if she took the baby to the hospital, "I'm going to have you locked up and [the Department of Social Services (DSS)[6]] is going to take the babies away." Thad was still crying, and he cried "for a whole twenty minutes." Mary held him for the next two hours. She was afraid to get help because she believed she would lose custody of the twins if she did.

Two days later, Thad was still behaving differently. Mary

---

[6]DSS became known as the Department of Children and Families after the events at issue in this case. See St. 2008, c. 176, § 25.

testified he "was not doing anything," he was "cranky," and he had a fever and diarrhea. Mary called an ambulance and went to the hospital with Thad for the third time that month. The defendant did not accompany her. Thad was admitted to the hospital but Mary did not reveal what she had seen at home because she was afraid the defendant would make good on her threats. Thad was discharged two days later, on about March 4, 2008, with instructions to keep him hydrated.

At home, Thad seemed to be doing a little better and "acting himself again like a little bit." On March 6, 2008, Mary went to school and left Thad in Cruz's care. When she got home, Cruz told her that Thad was at the hospital, the fourth time in thirty days, because, according to Cruz, he had had another choking episode. Mary got a ride to the hospital from her downstairs neighbor. Approximately two hours later the defendant and Cruz joined Mary there. The defendant warned Mary, in Spanish, "not to say anything," and she complied. At the hospital, Mary learned Thad had serious injuries, including a skull fracture.

Around dinner time, Mary went home to get some food and clothes. She expected to return to the hospital. The police and DSS employees were at the home. The defendant again warned Mary, in Spanish, not to say anything or she would have her locked up and DSS would take custody of the babies. A police detective at the home overheard the defendant tell Mary something in Spanish. Mary again denied having any knowledge of what had happened to Thad.

The police also interviewed Cruz. He explained that he had been the sole caretaker for Thad earlier that day when he noticed that Thad "had shortness of breath, difficulty breathing, and his eyes were rolling back to his head," so he called 911. Cruz admitted that a similar incident had occurred the previous week, during which the child had diarrhea, difficulty breathing, and the same rolling eyes, and he was admitted for treatment at the hospital. Cruz claimed he had no idea how Thad's skull fracture happened.

Later that night Mary learned that DSS was going to take custody of the children, and she then admitted she had seen Cruz abuse Thad and described what he had done. Mary also told the police that the defendant had threatened to have her

locked up and take away her children if she said anything about the abuse.[7]

Dr. Stephen C. Boos, a board-certified pediatrician and the medical director of the Family Advocacy Center at Baystate Medical Center, testified as an expert witness. He specialized in child abuse assessment. He had no personal involvement in Thad's medical care, but he had reviewed all of Thad's medical records, including those for the emergency room visits and hospitalizations in February and March, 2008. When Thad was admitted to the hospital on March 6, 2008, he was having a seizure, which Dr. Boos testified was as an unequivocal indication that something abnormal was going on in Thad's brain. He testified that if left untreated, a seizure may either stop by itself or continue "until the child's brain runs out of sugar and oxygen and the child dies." Regardless of the ultimate outcome, Dr. Boos testified that in his opinion such a seizure creates a substantial risk of death in a six month old infant. At the hospital, Thad received a series of medications until the seizure stopped.

Thad underwent a computer tomography (CT) scan of his brain, which revealed that he was suffering from multiple subdural hematomas containing both old and new blood. Dr. Boos explained that subdural hematomas always "result from some abnormal process," most typically trauma. He estimated that the older blood was from about twenty-one days ago, and the new blood was most likely from a trauma that occurred less than seven days earlier, but in each instance Dr. Boos made clear that there was substantial "room for softness" in those numbers. Dr. Boos testified that there is a substantial risk of death from blood collecting around the brain.

In addition to the subdural hematomas, Dr. Boos testified that the CT scan revealed multiple lines of cracking that intersected in a rough H-pattern on Thad's skull. Dr. Boos explained that this was a complex skull fracture and was more serious than a simple fracture because "it's a sign of a more forceful impact, more significant trauma." Dr. Boos testified that a simple fracture can occur when a child falls from a bed or changing table, but a complex fracture requires more force, such as a fall from a

---

[7]Mary was placed in foster care on or about March 6, 2008.

greater height, or from an object like a television falling on a child's head. Dr. Boos opined that if Thad's head was five feet above the ground when he was dropped, that would "provide for more force" which could result in a "significant injury such as this."

Dr. Boos noted that hematomas and skull fractures can be related, but they can also be independently caused. He further testified that with respect to these type of injuries, there are often no visible signs of the injury, but it is possible to "feel a swelling over the skull fracture." A skeletal examination of Thad did not disclose any other fracture. An examination of Thad's eyes, however, revealed multiple retinal hemorrhages and a raw spot, or vitreous hemorrhage, both of which are associated with abusive head trauma and violent shaking of the head back and forth.

Dr. Boos concluded that Thad's injuries were inflicted, not accidental. He further opined that a forceful impact to the head was a component of the inflicted injury, in addition to shaking the child. In his opinion, Thad's injuries created a substantial risk of death. Death was averted by the medical care Thad received at the hospital.[8]

Neither Cruz nor the defendant testified at trial, presenting their cases instead through cross-examination and argument. Cruz maintained that Mary caused Thad's injuries. Based on this same theory, the defendant claimed that Mary was not credible, that no injury had occurred on February 29, and that Mary had lied to protect herself. Alternatively, the defendant argued that even if Thad was hurt, no harm or injury was readily apparent that should have prompted the defendant to help Mary obtain medical care for him at that time.

1. *Sufficiency of the evidence.* The defendant challenges the sufficiency of the evidence supporting her conviction of reckless endangerment of a child under G. L. c. 265, § 13L.[9] "The

---

[8]Thad was released from the hospital on March 12, 2008. He required neurosurgical follow-up appointments and would be on medication for some period of time, but "in general," Dr. Boos testified, Thad "appeared to be in good condition."

[9]The relevant portion of the statute provides:

"Whoever wantonly or recklessly engages in conduct that creates a

elements of § 13L are (i) a child under eighteen; (ii) a substantial risk of serious bodily injury . . . ; (iii) the defendant wantonly or recklessly engaged in conduct that created this substantial risk, or failed to take reasonable steps to alleviate such risk where there is a duty to act." *Commonwealth* v. *Roderiques*, 462 Mass. 415, 422 (2012).[10] Because there is no dispute that Thad is a child within the meaning of the statute, the defendant focuses on the two remaining elements. With respect to the second element, the defendant argues that there was no evidence that Thad's fall caused the skull fracture, and alternatively, even if the fall did cause the fracture, there was no medical evidence that the fracture placed Thad at risk of serious bodily injury or death. The defendant overlooks the overwhelming evidence to the contrary.

Mary provided eyewitness testimony that on February 29, 2008, Cruz dropped six month old Thad from above Cruz's head to a tile floor and that Thad struck his head on the floor. The medical evidence showed that more recent subdural hematoma discovered in Thad's skull occurred within seven days of March 6, 2008, a period that included the date Mary saw Cruz drop Thad. Additional medical evidence revealed that Thad suffered a complex skull fracture, and while the fracture and the subdural hematoma could be related, the fracture clearly established that the infant had been subjected to a significant force, such as being dropped from a five-foot height. This medical evidence was entirely consistent with Mary's eyewitness

---

substantial risk of serious injury or sexual abuse to a child or wantonly or recklessly fails to take reasonable steps to alleviate such risk where there is a duty to act shall be punished . . . .

"For the purposes of this section, such wanton or reckless behavior occurs when a person is aware of and consciously disregards a substantial and unjustifiable risk that his acts, or omissions where there is a duty to act, would result in serious bodily injury or sexual abuse to a child. The risk must be of such nature and degree that disregard of the risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

G. L. c. 265, § 13L, inserted by St. 2002, c. 322, § 2.

[10]There appear to be only two reported cases in Massachusetts that have substantively considered this offense, namely, *Commonwealth* v. *Hendricks*, 452 Mass. 97 (2008), and *Commonwealth* v. *Roderiques*, 462 Mass. at 422.

account of the February 29 incident. Dr. Boos's additional testimony that these injuries were inflicted further bolstered the evidence that the injury occurred when Thad was dropped. Finally, Dr. Boos's testimony that left untreated, Thad's inflicted injuries created a substantial risk of death, rendered proof of the second element of the offense overwhelming. In fact, treatment at the hospital stopped Thad's seizures and may have prevented his death.

The defendant further argues that the evidence was insufficient to establish the third element of the offense, i.e., that the defendant wantonly or recklessly engaged in conduct that created a substantial risk or failed to take reasonable steps to alleviate such risk where she had a duty to act. First, the element requires proof of wanton or reckless conduct. Such conduct has long been understood in the criminal law as "intentional conduct . . . involv[ing] a high degree of likelihood that substantial harm will result to another."[11] *Commonwealth* v. *Levesque*, 436 Mass. 443, 451-452 (2002), quoting from *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944). Such intentional conduct "is grounded in intent to engage in the reckless conduct and not intent to bring about the [substantial risk of serious bodily injury]." *Commonwealth* v. *Levesque, supra* at 452. At the outset, therefore, proof that the defendant either knew or should have known that there was a substantial and unjustifiable risk is required. See generally *Commonwealth* v. *Welansky, supra* at 398-399; *Commonwealth* v. *Robinson*, 74 Mass. App. Ct. 752, 760 n.6 (2009).

Here, contrary to the defendant's contention, there was ample evidence that she knew or should have known that there was a substantial and unjustifiable risk of harm to Thad. The testimony at trial showed that within minutes of the incident, Mary informed the defendant that Cruz had dropped Thad from a height above Cruz's head onto the tile floor and that Thad struck his head on the floor when he landed. The testimony also permitted the

[11]"This standard of culpability is reinforced by . . . statutory language explicitly providing that 'wanton and reckless' behavior 'occurs when a person is aware of and consciously disregards a substantial and unjustifiable risk that his acts . . . would result in serious bodily injury . . . to a child.' G. L. c. 265, § 13L." *Commonwealth* v. *Hendricks*, 452 Mass. at 104.

inference that the defendant would have heard Thad's twenty-minute, unabated crying following the incident, and further, that she was well aware of Thad's general medical condition and illness, given his two prior hospital visits that month. This evidence, together with Mary's plea to get medical care for Thad, plainly suggests that Thad had just suffered a significant blow to his head.

A person of common intelligence would understand that a significant blow to an infant's head can cause serious bodily injury or even death. See, e.g., *Commonwealth* v. *Gallison*, 383 Mass. 659, 667 (1981) (jury free to conclude from own common knowledge and experience that failure to obtain emergency treatment for child with extreme fever and unconsciousness hastened child's death); *Commonwealth* v. *Robinson, supra* at 761. In these circumstances, the defendant knew or should have known that there was substantial risk that the failure to obtain medical treatment for Thad could cause serious bodily injury or death.

Despite this knowledge, the defendant did not merely refuse to take her teenage daughter (who was too young to drive) to the hospital with Thad, but she also confiscated Mary's cellular telephone, thus preventing her from even being able to summon an ambulance. In an effort to make sure that Thad's fall was not discovered, the defendant sent Mary to her room and threatened to have her jailed and her children removed if she sought help. These actions permit an inference that the defendant knew that the fall might be serious and that, if discovered, it might criminally inculpate her boyfriend, Cruz. Taken as a whole, the evidence was sufficient to support a conclusion that the defendant knew of and consciously disregarded a substantial and unjustifiable risk. Cf. *Commonwealth* v. *Levesque*, 436 Mass. at 453.

The defendant further claims that in these circumstances, she had no duty to act. The evidence was undisputed that Thad's mother, Mary, was the defendant's teenage daughter, for whom the defendant was responsible. That responsibility surely included helping fifteen year old Mary obtain medical care for her injured infant who resided in the defendant's household, particularly where the defendant had taken Mary and Thad to various physician and hospital visits on other occasions. Furthermore, the defendant did not merely fail to obtain, or help Mary to obtain,

medical treatment for Thad: she affirmatively prevented him from being treated immediately. Thwarting medical care for a baby who had just suffered a significant blow to his head supported not only the failure to obtain medical care, but the affirmative creation of a substantial risk of serious bodily injury by denying him care. Cf. *Commonwealth* v. *Twitchell*, 416 Mass. 114, 117-118 (1993).

The defendant also argues that the evidence was insufficient to prove causation because no evidence was adduced that the lack or delay of medical care "caused [Thad's] condition to become more serious." The difficulty here is that the crime of reckless endangerment does not require proof of injury, only proof of a substantial risk of injury. See *Commonwealth* v. *Roderiques*, 462 Mass. at 423. In *Commonwealth* v. *Hendricks*, 452 Mass. 97, 103 (2008), the defendant was convicted of reckless endangerment when he fled from police in a high-speed automobile chase, accompanied by his three year old son. Although there was no injury to the child in *Hendricks*, the court made clear that the defendant's "behavior created the type of 'substantial and unjustifiable risk' of serious bodily injury to a child that any person of common intelligence would understand to be well within the boundaries of [G. L. c. 265, § 13L's,] prohibition." *Ibid.* The same may be said in this case: delaying or obstructing medical care for a baby who has just suffered a significant blow to his head creates a substantial and unjustifiable risk of serious bodily injury. The defendant's reliance on *Commonwealth* v. *Levesque*, 436 Mass. at 454, is misplaced, because there the defendant's delay in reporting a fire had to be causally connected to the resulting six deaths. Here, the defendant's conduct must be causally linked only to the creation of substantial risk of bodily injury, and the failure to obtain medical treatment for a significant blow to a baby's head created such a risk, as was made clear by the testimony of Dr. Boos.

2. *Jury instructions.* For the first time on appeal, the defendant challenges three aspects of the judge's instructions to the jury. We review the challenges under the substantial risk of a miscarriage of justice standard. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

a. *Duty to act.* In connection with the defendant's duty, under

G. L. c. 265, § 13L, to act, the judge instructed the jury as follows:

> "To prove [the] first element, the Commonwealth must prove that [the defendant] had a duty to act. The duty to act does not mean a duty imposed by statute or regulation. Ordinarily one who takes action owes a duty to everyone who may be affected to act reasonably.
>
> "Our laws, both civil and criminal, impose a duty on people to act reasonably; that is, to conform to a standard of conduct. The standard of conduct is how a reasonable person under the circumstances would conduct herself or himself. . . .
>
> "The Commonwealth must prove that [the defendant] was aware of and disregarded a substantial and just — unjustified risk that her omission, that is, her failure to get medical treatment for [Thad] on February 29 of 2008, in circumstances where she had a duty to him, was intentional and was a gross deviation from the standard of conduct that a reasonable person would have followed under the circumstances known to [the defendant]."

The instruction reversed the proper relationship between duty and the standard of behavior required of an individual after a duty is established. The judge's instruction that "[o]ur laws, both civil and criminal, impose a duty on people to act reasonably; that is, to conform to a standard of conduct," was incorrect. However much one might consider reasonable behavior the touchstone of a civilized society, we do not impose criminal liability for unreasonable behavior unless we have first established an underlying duty, normally emanating from specified acts or a defined relationship. In this case the judge instructed only on the defendant's failure to act. It was therefore crucial to the Commonwealth's case to establish that the defendant's relationship to the victim created a legal duty, in this instance, to ensure that he receive medical attention. See generally *Commonwealth v. Twitchell*, 416 Mass. at 117 ("A charge of involuntary manslaughter based on an omission to act can be proved only if the defendant had a duty to act and did not do so"). The instruc-

tion, unfortunately, gave the jury permission to conclude that they could infer the existence of such a duty simply from a failure to act reasonably.

The remaining language of the instruction did not cure the problem. The phrase, "[o]rdinarily *one who takes action* owes a duty to everyone who may be affected to act reasonably" (emphasis added), was at best confusing and at worst, inasmuch as the charge against the defendant was for failure to act, misleading. Finally, the statement that "[t]he standard of conduct is how a reasonable person in the circumstances would conduct herself or himself" again invited the jury to assume the existence of a duty despite the fact that they had not been given the factual prerequisites to make such a finding.

In order to avoid such confusion in future cases we refer to District Court Model Jury Instruction 6.540 (May, 2011), which includes a definition of the duty to act, that is to "take reasonable steps to alleviate that risk to the child" pursuant to G. L. c. 265, § 13L.[12] This instruction, which was not available to the Superior Court judge at the time of trial, states in pertinent part:

> "Parents and legal guardians have a legal duty to take reasonable steps to prevent harm to a child in their care. Those who accept responsibility as caretakers also have a duty to take reasonable steps to prevent harm to a child who is in their care. Other persons may also have a duty to alleviate a risk of harm to a child. You should look to the facts of this case to determine whether the Commonwealth has proven that the defendant had this duty to act."

The defendant not only failed to contest the caretaker role before the jury (a role which the jury, properly instructed, could have found to be the basis of her duty), but also actively asserted that she was the victim's caretaker, and that she had safeguarded his welfare in that role.[13] In these circumstances, where counsel twice declared herself satisfied with the instruc-

---

[12]The notes to the instruction provide references, especially apposite here, to the role of a caretaker ("any household member entrusted with the responsibility for a child's health or welfare"). 110 Code Mass. Regs. § 2.00 (1996). See, e.g., *Adoption of Fran*, 54 Mass. App. Ct. 455, 459-461 (2002).

[13]During trial, the defendant placed the blame for the injuries on her daughter

tions, we cannot fairly say that there was a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Shea*, 398 Mass. 264, 269 (1986) (erroneous instruction as to intent did not create substantial risk of miscarriage of justice where intent was not contested at trial). See generally *Commonwealth* v. *Mountry*, 463 Mass. 80, 92-94 (2012) (failure to instruct harmless in light of evidence at trial).

Nor did the judge err when he further instructed the jury, in response to a question, that Mary's custody of Thad did not absolve the defendant of criminal liability if the elements of the charged offense were proved. The answer was one of common sense. Legal custody of a child does not absolve every other caretaker of criminal liability for their own acts related to that child. See *Commonwealth* v. *Torres*, 442 Mass. 554, 569 (2004).

b. *Causation.* The defendant argues that the jury should have been instructed that the Commonwealth needed to prove that medical care would have actually alleviated a risk. As noted above, there is no such requirement. The crime requires only proof that, in this case, delay or blocking of medical care created a risk. See *Commonwealth* v. *Hendricks*, 452 Mass. at 103 (Commonwealth was only required to prove that taking three year old child on high-speed automobile chase created risk). There is no concomitant obligation to prove that a particular type of harm did not come to fruition.

c. Ciampa *instruction.* There is no merit to the defendant's claim that the judge, sua sponte, should have given a so-called *Ciampa* instruction, see *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989), and that the absence of such instruction created a substantial risk of a miscarriage of justice. The defendant claims that because the Commonwealth promised, in writing, not to charge Mary in relation to this matter, the jury should have been told to study her testimony "with particular care" and further instructed that the Commonwealth had no "special knowledge" with which to verify that Mary was telling the truth. See *id.* at 265-266. No such instruction was required here.

Mary, the child's mother, and elicited evidence that she, herself, had been a careful caretaker. She requested that the judge instruct the jury that only her daughter, the legal guardian, had a duty to the child, but the judge rejected this argument and counsel did not object.

The prosecutor did not suggest to the jury that Mary had a special obligation to tell the truth pursuant to her agreement with the Commonwealth, and no portion of the written agreement was before the jury. See *Commonwealth* v. *Washington*, 459 Mass. 32, 44 n.21 (2011). See also *Commonwealth* v. *Dixon*, 425 Mass. 223, 233 (1997). The judge instructed the jury that in assessing witness credibility, they should consider "whether the witness has an interest in the outcome of the case, [and] whether there's evidence of some bias or motive for the witness's testimony." In these circumstances, there was no substantial risk of a miscarriage of justice.

3. *Medical records.* The defendant argues error in the admission of two statements contained in Thad's redacted medical records, which were admitted in evidence. Specifically, one notation reads that "DSS/social work was involved . . . in the past," and the second notation states "[h]istory of abuse in past 12 months." Although the defendant sought to exclude these portions of the medical records prior to trial, she did not object at trial to the admission of these statements, and we therefore review under the substantial risk of a miscarriage of justice standard. See *Commonwealth* v. *Whelton*, 428 Mass. 24, 25-26 (1998). Even if we assume error, we perceive no such risk.

None of the prior instances involving DSS was discussed at trial. The notations in the medical record were brief and lacking in detail. Questions posed by the jury during deliberations suggest that they were clearly focused on the elements of the charged offenses and not any prior misconduct.[14] Finally, the jury's acquittal of the defendant of one of the two charges lodged against her and their acquittal of Cruz of two of four charges against him, combined with a conviction on only the lesser included offense of the most serious count, is strong evidence of the jury's ability to focus on the actual element of guilt and that they were not unduly swayed by the purportedly prejudicial notations.

4. *Vagueness.* The defendant also claims for the first time on appeal that G. L. c. 265, § 13L, is unconstitutionally vague as applied to the circumstances of her case, in violation of the due

---

[14]The jury questions related to the element of duty, the definition of touching without justification, and the difference between "substantial injury" and "bodily injury."

process clause of the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. Unlike a facial challenge to a statute, which should be brought in a pretrial motion to dismiss, an as-applied challenge may be preserved in a motion for a required finding of not guilty after the Commonwealth has presented its evidence. See *Commonwealth* v. *Jasmin*, 396 Mass. 653, 655 (1986). Here, the defendant offered neither motion. We decline to consider the claim. However, even if we were to exercise our authority to review the claim, we would do so "only in response to a serious and obvious error creating a substantial risk of a miscarriage of justice." *Commonwealth* v. *Oakes*, 407 Mass. 92, 94-95 (1990), quoting from *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987). That situation is not present in this case. To the extent the defendant argues that the evidence is insufficient to establish the elements of the offense, this is not a vagueness challenge. We review a claim that a statute is unconstitutionally vague as applied to certain conduct with a view of the facts in the light most favorable to the Commonwealth. See *id.* at 95. Moreover, a person of common intelligence would understand that failing to get medical care for, or obstructing medical care from being delivered to, a baby who has been dropped from a height of five feet onto a floor and who has struck his head on a tile floor is behavior well within the parameters of the law's prohibition. See *Commonwealth* v. *Chapman*, 433 Mass. 481, 487 (2001) (vagueness challenge rejected where defendant was prosecuted for intentional acts and omissions that permitted infant to be placed at risk of such injury).

*Judgment affirmed.*