Commonwealth vs. Thomas Hendricks.

Barnstable. May 7, 2008. - July 31, 2008.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Reckless Endangerment of a Child. Constitutional Law,* Vagueness of statute. *Practice, Criminal,* Waiver of trial by jury.

There was no ambiguity in the language of G. L. c. 265, § 13L, prohibiting the reckless endangerment of a child, that required its application to be limited to conduct that exposed a child to (or failed to protect a child from) the substantial risk of serious injury from physical or sexual abuse; rather, the plain language of the statute proscribed all wanton and reckless conduct that created a substantial (and unjustifiable) risk of serious bodily injury to a child [100-102]; moreover, the statute provided a reasonable opportunity for a person of ordinary intelligence to know that the type of conduct in which the defendant had engaged (i.e., deliberately embarking on a high-speed nighttime chase, to evade and elude the police, with a three year old child in his charge) would be well within the boundaries of the statute's prohibition [102-103], and explicit requirements set forth in the statute ensured that it was not open to arbitrary and discriminatory enforcement [103-104].

In the circumstances of a jury-waived criminal trial, where the judge made findings with respect to all of the elements of the charge of reckless endangerment of a child, the evidence (that the defendant deliberately embarked on a high-speed nighttime chase, to evade and elude the police, with a three year old child in his charge) was plainly sufficient to establish guilt [104-105], without regard to whether the defendant was aware that a police dog would be used to track him down after he had fled on foot with the child [105-106]; moreover, the judge's offhand comment during defense counsel's closing did not constitute a finding that a required element was not proved [105].

Even if sparse, the colloquy between the judge and the defendant at a criminal trial was sufficient to furnish the judge with the facts necessary to warrant the findings that the defendant was aware of the differences between a jury and jury-waived trial, that he had not been coerced or improperly influenced in his decision to waive a jury trial, and that he was rationally capable of executing the waiver. [106-108]

Complaints received and sworn to in the Falmouth Division of the District Court Department on September 9, 2004.

The cases were heard by *Michael C. Creedon,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Allison J. Koury* for the defendant.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

CORDY, J. Having been convicted of reckless endangerment of a child in violation of G. L. c. 265, § 13L, Thomas Hendricks challenges the constitutionality of the recently enacted statute, claiming that it is vague and overbroad as applied to the circumstances of his case.[1] He also contends that there was insufficient evidence to sustain his conviction, and that his waiver of the right to a jury trial was not made knowingly and voluntarily. We affirm.

1. *Background.* On September 8, 2004, at approximately 9:45 P.M, while performing "stationary radar" in Mashpee, Officer Jason Arthurs observed Hendricks driving a grey sedan. From personal knowledge, Arthurs knew that Hendricks's driver's license had been revoked. He activated the emergency lights on his police cruiser in an attempt to pull over Hendricks's vehicle. Instead of pulling over, Hendricks accelerated and turned onto Route 151.

Arthurs proceeded to follow Hendricks with his emergency lights and siren blaring. When Arthurs was approximately twenty feet behind Hendricks's vehicle, the vehicle "rocketed forward," reaching a speed of approximately sixty-five miles per hour on roadways with posted speed limits of thirty and forty miles per hour.

Hendricks turned onto Algonquin Road, an unpaved roadway with a number of potholes that takes a sharp right by a pond and then narrows substantially. Hendricks continued to travel at a high rate of speed. Arthurs reduced his speed to thirty-five miles

---

[1]Thomas Hendricks did not file a pretrial motion to dismiss the complaint on the ground that the statute was facially vague or overbroad. See *Commonwealth* v. *Moses,* 436 Mass. 598, 605 n.4 (2002). To the extent that he attempts to raise such a claim for the first time on appeal, we decline to consider it. Moreover, insofar as his vagueness challenge to the statute does not involve a claim that an overbroad statute threatens interests protected by the First Amendment to the United States Constitution, Hendricks is "entitled to assert only his rights and not those of others who might be affected by the challenged statute in some different way." *Commonwealth* v. *Jasmin,* 396 Mass. 653, 655 (1986).

per hour because of the "terrible" road conditions, and fell further behind Hendricks, keeping his brake lights in sight.

Algonquin Road comes to a dead end from which a dirt pathway extends into the woods. At the dead end, there are rocks on either side of the roadway, and an embankment between them. The embankment's slope is approximately two feet high. Arthurs observed Hendricks's vehicle pass between the rocks, go up and over the embankment, and proceed down the dirt pathway into the woods. Arthurs called for backup, parked his cruiser, and proceeded to pursue Hendricks on foot.

Hendricks's vehicle was located, unoccupied, approximately 200 to 300 yards into the woods. Arthurs and a K-9 officer with his dog began to track Hendricks. They located him further in the woods, lying on his back, with his three year old child on his chest. Hendricks told them that he had his child with him and asked them not to send the dog. They complied, and Hendricks surrendered his child to the officers and followed their orders. While they were walking through the woods, Hendricks admitted to Arthurs that he should not have been driving like that with his daughter in the vehicle and that he should have stopped.

In addition to being charged with reckless endangerment of a child, Hendricks was charged with speeding and a number of criminal motor vehicle violations, including refusing to stop for the police, G. L. c. 90, § 25; operating a motor vehicle with a suspended license, G. L. c. 90, § 23; and reckless operation of a motor vehicle, G. L. c. 90, § 24 (2) (a). After a jury-waived trial, the judge found Hendricks not guilty of operating a motor vehicle with a suspended license and of the reckless operation of a motor vehicle,[2] guilty of reckless endangerment of a child

---

[2] The judge granted Hendricks's motion for a required finding of not guilty on the charge of operating a motor vehicle with a suspended license after the Commonwealth failed to introduce a certificate from the registry of motor vehicles establishing that the license had been suspended or revoked. After the close of arguments, the judge found Hendricks not guilty of the reckless operation of a motor vehicle. In doing so, the judge appears to have mistakenly thought that the Commonwealth had to prove that Hendricks's operation of the motor vehicle was "likely to cause death," and concluded that the Commonwealth had failed to prove that element. However, the statute merely requires, in relevant part, proof that a defendant operated a motor vehicle

and of failing to stop for the police, and responsible on the speeding charge.

2. *Discussion.* a. *Reckless endangerment of a child.* General Laws c. 265, § 13L, inserted by St. 2002, c. 322, § 2, became effective on December 11, 2002, and provides in relevant part:

> "Whoever wantonly or recklessly engages in conduct that creates a substantial risk of serious injury or sexual abuse to a child or wantonly or recklessly fails to take reasonable steps to alleviate such risk where there is a duty to act shall be punished by imprisonment in the house of correction for not more than 2 ½ years. . . .

> "For the purposes of this section, such wanton or reckless behavior occurs when a person is aware of and consciously disregards a substantial and unjustifiable risk that his acts, or omissions where there is a duty to act, would result in serious bodily injury or sexual abuse to a child. The risk must be of such nature and degree that disregard of the risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

Hendricks essentially claims that the statute was intended to apply to a person whose conduct exposes a child to (or fails to protect a child from) the substantial risk of serious injury only from physical or sexual abuse, and not from other sources of harm. He further contends that if his conduct, which he describes as "speeding" and "failing to stop for police," is determined to constitute reckless endangerment under the statute, then the statute is unconstitutionally vague in that it failed to provide adequate notice of that consequence, and sufficiently explicit standards for its application. We disagree.

As to the reach of the statute, Hendricks relies on the preamble to its enactment, St. 2002, c. 322, § 1, which contains legislative findings with regard to the "growing numbers of complaints concerning the sexual abuse of minors by non-custodial adults who have been recklessly placed or retained in positions of trust and authority," and the "necessity to protect children from

---

recklessly or negligently "so that the lives or safety of the public might be endangered." G. L. c. 90, § 24 (2) (*a*).

physical and sexual abuse by penalizing reckless behavior that creates a risk of serious physical injury or sexual abuse to a child." *Id.*[3] While we acknowledge that the preamble contains these findings and that the Legislature intended to penalize conduct that creates a substantial risk of physical or sexual abuse, the plain language of the statute enacted sweeps more broadly to proscribe all wanton and reckless conduct that creates a "substantial [and unjustifiable] risk of serious bodily injury" to a child. There is no ambiguity in the statutory language that would lead us to limit its application in the manner Hendricks suggests. See *Commissioner of Correction* v. *Superior Court Dep't of the Trial Court for the County of Worcester*, 446 Mass. 123, 124 (2006) (where language is clear and unambiguous, it is conclusive as to legislative intent). Nor does its application as written lead to an irrational result. See *Commonwealth* v. *McLeod*, 437 Mass. 286, 290 (2002), quoting *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001) ("statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result"); *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 355 (1973) (we must avoid construction of statutory language that produces irrational results). It is perfectly reasonable for the Legislature to protect children from the wanton and reckless acts of adults that pose serious and substantial risks to children's physical safety. If the Legislature had intended a narrower set of

---

[3]In St. 2002, c. 322, § 1, the Legislature explained the genesis of the provision:

"The general court finds that the majority of state criminal codes and the model penal code include reckless endangerment offenses. These crimes punish reckless conduct that creates a risk of, but do not necessarily result in, serious physical injury. . . . The general court further finds that there are growing numbers of complaints concerning the sexual abuse of minors by non-custodial adults who have been recklessly placed or retained in positions of trust and authority. The general court recognizes that reckless behavior may serve as the basis for criminal liability for certain crimes committed in the commonwealth. The general court hereby finds that there is a significant public interest and urgent necessity to protect children from physical and sexual abuse by penalizing reckless behavior that creates a risk of serious physical injury or sexual abuse to a child. It is the intention of the general court to penalize reckless behavior . . . which results in a risk of serious physical injury or sexual abuse to a child."

protections, it readily could have drafted the statute to accomplish that more limited objective. See, e.g., *Commonwealth* v. *Cahill*, 442 Mass. 127, 134 (2004) ("If the Legislature had intended for the amended paragraphs of [the statute] governing license revocation to apply to second offenders . . . it easily could have included language to that effect"); *Brittle* v. *Boston*, 439 Mass. 580, 590, 594 (2003), quoting *Commonwealth* v. *McLeod*, *supra* at 294 ("We will not add words to a statute that the Legislature did not put there, either by inadvertent omission or by design"; restrictive language of statute demonstrated that Legislature purposely drafted statute with "narrow focus").

The questions we must therefore resolve are whether the statute "provides a reasonable opportunity for a person of ordinary intelligence" to know that the type of conduct in which Hendricks engaged was prohibited, *Commonwealth* v. *Jasmin*, 396 Mass. 653, 655 (1986) and whether it provides "comprehensible standards that limit prosecutorial and judicial discretion" and thus avoid discriminatory or arbitrary enforcement. *Commonwealth* v. *Pagan*, 445 Mass. 161, 173 (2005). See *Commonwealth* v. *Gallant*, 373 Mass. 577, 580 (1977). If the answer to either question is "no," the statute will fail under the vagueness doctrine, which is grounded in the due process guarantees of the Massachusetts Declaration of Rights and the United States Constitution. *Commonwealth* v. *Jasmin*, *supra* ("A law is unconstitutionally vague and denies due process of law if it fails to provide a reasonable opportunity for a person of ordinary intelligence to know what is prohibited or if it does not provide explicit standards for those who apply it"). However, as we have explained, that "doctrine requires simply that the statute be drafted in such form as to present 'ascertainable standards of guilt,' " *Opinions of the Justices*, 378 Mass. 822, 827 (1979), quoting *Winters* v. *New York*, 333 U.S. 507, 515 (1948); and is not "designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Commonwealth* v. *Gallant*, *supra*, quoting *Colten* v. *Kentucky*, 407 U.S. 104, 110 (1972). In other words, a law is "not vague . . . if it requires a person to conform his conduct to an imprecise but

comprehensible normative standard so that men of common intelligence know its meaning." *Commonwealth* v. *Gallant, supra,* quoting *Commonwealth* v. *Orlando,* 371 Mass. 732, 734 (1977).

As established at trial, Hendricks, with a three year old child in his charge, deliberately embarked on a high-speed nighttime chase, to evade and elude the police. During that chase, Hendricks reached speeds in excess of twice the speed limit and traveled over unpaved roadways that were narrow, scarred with pot holes, and contained sharp turns. The chase ended only after Hendricks drove over an embankment and several hundred yards into the woods, where he fled on foot (with the child) with the police in pursuit. This behavior created the type of "substantial and unjustifiable risk" of serious bodily injury to a child that any person of common intelligence would understand to be well within the boundaries of the statute's prohibition. The due process requirement of notice is fully met in this case.

Hendricks contends further, however, that, even if the statute provided him adequate notice, it failed to provide sufficient guidance with respect to its enforcement. He suggests, for example, that any person driving an automobile in excess of the speed limit with a child in the vehicle could be subject to prosecution under this interpretation of the statute, and that such a broad reach opens the statute to arbitrary and discriminatory enforcement. We disagree. There are a number of explicit requirements set forth in the statute that appropriately limit such possibilities. First, the conduct must create a "substantial risk" of "serious bodily injury," that is, a risk "of such nature and degree that disregard of the risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." G. L. c. 265, § 13L. In other words, the risk must be a good deal more than a possibility, and its disregard substantially more than negligence. In addition, the harm at risk must be of a very serious nature, defined as injury "which results in a permanent disfigurement, protracted loss or impairment of a bodily function, limb or organ, or substantial risk of death." G. L. c. 265, § 13L.

These requirements are consistent with the statute's description of the type of conduct proscribed as wanton and reckless. Such conduct is well understood in the criminal law. It is

"intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944). This standard of culpability is reinforced by further statutory language explicitly providing that "wanton and reckless" behavior "occurs when a person is aware of and consciously disregards a substantial and unjustifiable risk that his acts . . . would result in serious bodily injury . . . to a child." G. L. c. 265, § 13L. Simply put, the statute presents "ascertainable standards of guilt," *Opinions of the Justices*, *supra* at 827, that do not "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Commonwealth* v. *Gallant*, *supra* at 580, quoting *Grayned* v. *Rockford*, 408 U.S. 104, 108-109 (1972).

b. *Sufficiency of the evidence.* In reviewing its sufficiency, we look at the evidence in the light most favorable to the Commonwealth to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). "[T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.' " *Id.* at 677, quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928). A finding of guilty may be warranted "even though the inference of guilt from the facts established is not inescapable or necessary." *Commonwealth* v. *Anselmo*, 33 Mass. App. Ct. 602, 604 (1992), quoting *Commonwealth* v. *Gagnon*, 408 Mass. 185, 200-201 (1990).

Conviction of the crime of reckless endangerment required proof that Hendricks was aware of and consciously disregarded a substantial and unjustifiable risk that his acts would result in serious bodily injury to a child, and that his disregard of that risk was a gross deviation from the standard of conduct that a reasonable person would observe in the situation. At the conclusion of the trial, the judge found that all of the elements of the crime had been established, explaining that he was convinced beyond a reasonable doubt that Hendricks's conduct had violated

the law by "not only the driving, but the nighttime running through the woods with the child," the dog coming "after. Who knows what the dog would have done." His findings are fully supported by the evidence.

Nevertheless, Hendricks complains that the judge's findings were contradictory and erroneous in several respects. For example, although conscious disregard of the risk is an element of the crime, Hendricks points out that during defense counsel's closing argument, the judge stated that the evidence is "silent . . . relative to [Hendricks's] consciousness. And therefore, I won't speculate . . . ."

This statement appears to be an offhand comment that followed a discussion between defense counsel and the judge about whether there was any evidence that the child was secured in a car seat. There was not, and the judge stated that he would not speculate about unknown facts. After the Commonwealth made its closing argument, the judge returned to a discussion of the elements and the evidence, stating: "I believe that the language here is exactly what happened for the purpose of this section. Wanton or reckless behavior occurs when a person is aware of, and consciously disregards a substantial — and it's certainly a substantial risk when you drive off the road. . . . I think they've made that."

In the circumstances of this jury-waived trial, where the judge made findings with respect to all of the elements, and the evidence plainly was sufficient to establish guilt, we do not conclude that the judge's interjection during defense counsel's closing constituted a finding that a required element was not proved.[4]

Hendricks also points out that the judge's description of Hendricks's dangerous conduct (and the risk it engendered) includes not only his driving, and flight through the woods, but also his

---

[4]Hendricks also contends that his acquittal of the charge of recklessly operating a motor vehicle is inconsistent with the judge's finding of guilt on the charge of reckless endangerment of a child. It is not. As noted above, see note 2, *supra*, the acquittal was based on an apparent misunderstanding by the judge that it was necessary for the Commonwealth to prove that the operation of the vehicle was "likely to cause death" in order to establish that it was reckless. The definition of serious bodily injury for purposes of G. L. c. 265, § 13L, includes an injury "which results" in a "substantial risk of death," as well as other serious outcomes short of death.

pursuit by a police dog. He contends that the use of a police dog was not known to him, and therefore the danger posed to his child was not one that he could "consciously" disregard.

Assuming that we agree that the evidence does not support the conclusion that Hendricks knew that a police dog would be used to hunt him down, it certainly was sufficient to establish that Hendricks knew he would be pursued by the police, at night, through the woods. Such a pursuit plainly placed the child at further risk of harm. In any event, the evidence of reckless endangerment was sufficient without regard to the dog, and we do not interpret the judge's finding of guilt to depend on the presence of the dog.

c. *Hendricks's jury trial waiver.* Hendricks commenced the waiver process by executing a written jury trial waiver form. That form was also signed by Hendricks's attorney, who certified that he had informed Hendricks that (1) "the jury consist[] of members of the community"; (2) "the defendant may participate in their selection"; (3) "the verdict of the jury must be unanimous"; (4) "the jury must decide guilt or innocence while the judge makes rulings of law . . . and instructs the jury on the law, and imposes a sentence in case of guilt"; and (5) "when [the empanelling of] a jury is waived, the judge alone decides guilt or innocence in accordance with the facts and the law."

As required by *Ciummei* v. *Commonwealth,* 378 Mass. 504, 507 (1979) (*Ciummei*), the judge then conducted a colloquy with Hendricks before accepting the waiver. See *Commonwealth v. Abreu,* 391 Mass. 777, 778 (1984). "The purpose of the colloquy is to include as part of the trial record evidence indicating whether the defendant's waiver of his right was sufficient to pass constitutional scrutiny," *id.* at 778-779, that is, whether it is intelligent and voluntary.

The judge began the colloquy by asking Hendricks his name and age, and informing him that by waiving a jury trial he was giving up the right to have citizens of Barnstable County hear the case, as opposed to the judge hearing the case. The judge explained that, if Hendricks were to have a jury, it would be people randomly selected from all over Cape Cod, and that the jurors would not know anyone involved in the case, and would have to accept the law as the judge explained it to them. The

judge also explained that Hendricks could participate in the selection of the jurors, and that the jury would decide the facts of the case. The judge further informed Hendricks that, while he was aware of Hendricks's prior criminal record, he would be neutral in deciding the facts of the case, and would base his findings on the facts presented to him during trial.

The judge then asked Hendricks whether he understood what had been explained, and whether he was giving up his right to a jury trial freely, willingly, and voluntarily. Hendricks responded in the affirmative, and the judge assured him that he would receive a fair trial.

Hendricks contends that his waiver was not voluntary and intelligent because the judge did not clearly and adequately highlight all the differences between a bench trial and jury trial in the colloquy (and, in particular, the requirement of unanimity in a jury trial), as recommended in *Ciummei, supra* at 509-510.[5] Looking at the colloquy as a whole, we disagree that it was inadequate.

In *Ciummei*, we did not intend to prescribe a rigid list of questions by which a judge determines whether a waiver of a jury trial is intelligent and voluntary. See *Commonwealth* v. *Abreu, supra*; *Commonwealth* v. *Onouha*, 46 Mass. App. Ct. 904 (1998). The omission of inquiries suggested as appropriate in *Ciummei* alone are not enough to make a colloquy inadequate. See *Commonwealth* v. *Hardy*, 427 Mass. 379, 383 (1998). See also *Commonwealth* v. *Schofield*, 391 Mass. 772, 775 (1984). So long as a colloquy occurs, the sole focus of our review is whether the colloquy provided an evidentiary record on which

[5]In *Ciummei* v. *Commonwealth*, 378 Mass. 504, 509-510 (1979), we stated: "We do not intend to create a rigid pattern but note that, where a defendant needs a compendious reminder, the judge *might* state that the jury consists of members of the community, that the defendant may participate in their selection, that the verdict of the jury must be unanimous, that they decide guilt or innocence while the judge makes rulings of law in the course of the trial, instructs the jury on the law, and imposes sentence in the case of guilt; and that where a jury is waived, the judge alone decides guilt or innocence in accordance with the facts and the law" (emphasis added). We also explained that the judge must confirm that the defendant has conferred with counsel about the waiver, that the defendant has not been pressured or coerced into the waiver, and that the defendant is not intoxicated or otherwise rendered incapable of making a rational decision. *Id.* at 510.

the judge could find the waiver was voluntary and intelligent. *Commonwealth* v. *Abreu, supra* at 779.

The validity of a colloquy must be decided on the facts of the case. Here, although the judge did not specifically address jury unanimity in the colloquy, the dialogue was sufficient to furnish the judge with the facts necessary to warrant the finding that Hendricks was aware of the differences between a jury and jury-waived trial, that he had not been coerced or improperly influenced in his decision, and that he was rationally capable of executing the waiver. *Commonwealth* v. *Schofield, supra* at 775 ("We did not intend to establish a rule that a defendant's waiver of his right to jury trial will be deemed valid only where a colloquy on the record evidences the defendant was aware of all the differences between bench and jury trials mentioned in *Ciummei*"). Even if sparse, the colloquy was sufficient. See *Commonwealth* v. *Onouha, supra* (colloquy sufficient to determine waiver of jury trial was voluntary and intelligent, where defendant signed waiver, indorsed by counsel, and judge emphasized that defendant, if he opted for bench trial, was leaving fact finding to judge, even though judge did not inquire whether defendant understood difference between jury and bench trials).[6]

*Judgments affirmed.*

---

[6]Hendricks also contends that the colloquy was invalid because the judge suggested that Hendricks would be better off having his case heard by the judge rather than by a jury, and that the jury would know of his criminal record. We interpret the judge's statements differently. During the colloquy, the judge noted that Hendricks had a lengthy record, but explained that he would not be affected by it. He stated: "As far as deciding the facts of the case, it makes no difference to me personally whether you've been arrested once or five thousand times. I operate on the theory that even a broken clock is correct twice a day. You know, otherwise, no one with a record like yours could ever get a fair trial unless you just look at all the elements that you have to prove." The judge continued: "I know you've run from the police a half-dozen times since I've been here. But that will not — will not — I repeat that — affect my decision here."

While it would have been preferable for the judge not to have made such comments, in context, and looking at the colloquy as a whole, it appears that the judge was simply attempting to assure Hendricks that he would receive a fair trial, regardless of whether it was a jury or bench trial, and even though the judge knew of his record.