Krupp, Peter B., J.
Defendant Johanny Hernandez was indicted on a variety of drug distribution charges following a lengthy undercover investigation of a drug distribution organization allegedly led by Miguel Santana a/k/a Pedro Valpais (“Santana”), the father of defendant’s children. She also faces a single indictment for reckless endangerment of a child in violation of G.L.c. 265, §13L.
The case came before me on (i) defendant’s motion to suppress the fruits of a search warrant issued June 19, 2013 for 49 Old Morton St., Apt. #2, Mattapan, Massachusetts (“the premises”), arguing that the facts presented to support the warrant application were stale; and (ii) defendant’s motion under Commonwealth v. McCarthy, 385 Mass. 160 (1982), seeking to dismiss the reckless endangerment charge.
*206 After oral argument on both motions on May 16, 2014, the motion to suppress is DENIED and the motion to dismiss is ALLOWED. I address each of the motions in turn.
DISCUSSION
I. The Motion to Suppress
Defendant’s motion to suppress contends that the information supplied in support of the warrant was too stale as it relates to the premises and therefore insufficient to support a warrant for the premises. The last purchase of heroin by the undercover officer at the premises was approximately 3 1/2 months prior to the issuance of the search warrants. The issuing judge, however, was not simply limited to those undercover purchases. Here, the affidavit presented significant evidence that there existed an ongoing drug conspiracy, and drug distribution network, which was using a number of locations and had continuing active contacts with the premises.
A. The Legal Framework
Under the Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights, a search warrant may be issued only upon a showing of probable cause. For a search warrant affidavit to demonstrate probable cause, it “must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues.” Commonwealth v. Cinelli, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983) (emphasis added). The mere fact that there is probable cause to believe a person has committed a crime involving illicit drug activity “does not necessarily establish probable cause to search that person’s residence for drugs.” Commonwealth v. Medina, 453 Mass. 1011, 1011 (2009) (re-script); Commonwealth v. Pina, 453 Mass. 438, 441 (2009); Commonwealth v. Stegemann, 68 Mass.App.Ct. 292, 294 (2007). Instead, the affidavit submitted in support of the application for a search warrant must establish “the requisite nexus between the items to be searched for (drugs and drug paraphernalia) and the place to be searched (the defendant’s apartment) to constitute probable cause to search.” Medina, 453 Mass. at 1011.
The showing of a nexus also must be “timely.” As the Supreme Judicial Court recently wrote, “(p)robable cause to search a particular location for contraband requires a timely, as well as a substantial, nexus to the illegal activity.” Commonwealth v. Pina, 453 Mass. at 442. In Pina, the search warrant affidavit reflected that defendant lived at the property to be searched, sold drugs over an unspecified period to a police informant, and three days before applying for the warrant was seen driving directly from his apartment to the location where he sold cocaine to the informant. 453 Mass. at 441-42. The majority in that case was troubled by the absence of particularized information linking the property to the storage or supply of drugs, especially where there was only one observation involving the location to be searched. On the issue of timeliness, the Court also wrote that “(t]he lapse of time between that observation and the application for the search warrant (three days) raises further concerns.” Id. at 442.
While its facts are somewhat unique, Pina does not change the definitions of “probable cause” and “nexus,” or the general application of those principles in situations where the evidence reflects a “protracted or continuous” drug distribution operation. See Commonwealth v. Matias, 440 Mass. 787, 792 (2004) (trash pull on day of affidavit demonstrated drug dealing activity observed six months before still ongoing); Commonwealth v. Burt, 393 Mass. 703, 716 (1985) (“[W]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance,” quoting Commonwealth v. Veynorious, 369 Mass. 17, 25 (1975)).
B. The Search Warrant Affidavit Was Sufficient to Demonstrate Probable Cause to Search the Premises.
The motion to suppress turns on the facts set out in the supporting affidavit. See Commonwealth v. O’Day, 440 Mass. 296, 297 (2003) (“inquiry as to the sufficiency of the search warrant application always begins and ends with the ‘four corners of the affidavit,’ ” quoting Commonwealth v. Villella, 39 Mass.App.Ct. 426, 428 (1995)). The affidavit runs to 58 pages. It is attached to the Commonwealth’s Opposition to the Defendants’ Motions to Suppress Evidence Recovered Pursuant to Three Search Warrants,[1] and need not be fully restated here. In contrast to Pina the affidavit describes a lengthy investigation beginning in November 2012 into drug trafficking activities allegedly run by Santana, including information from an informant, numerous small undercover purchases of heroin and cocaine, and extensive surveillance. Specifically, among other things, the affidavit establishes the following:
Over the period from November 2012 until early March 2013, an undercover officer (“UC”) was able to purchase heroin from or through Santana at the premises on at least the following dates: November 5 and 9, 2012, December 15 and 21, 2012, January 11 and 16, 2013, and March 6, 2013. On many of these occasions UC observed a larger quantity of illegal drugs present from which the drugs UC was purchasing were taken.
In addition to observing the larger quantity of drugs, UC also saw at the premises other evidence of ■a substantial and elaborate drug distribution operation. While purchasing heroin, UC observed surveil *207 lance equipment at the premises, which permitted occupants to observe the front of 49 Old Morton St. from a TV screen inside the premises. UC also observed a number of other individuals involved in the drug distribution operation who were present or who handed heroin to UC at the premises. On January 11, 2013, for example, defendant herself provided heroin to UC. Defendant appeared to live at the premises with her (and Santana’s) two children. On a number of occasions, UC observed a number of other purchasers at the premises.
On January 18, 2013, Santana told UC not to go to the premises because that location was “hot.[2] Instead, Santana instructed UC to go to South Boston. UC was able to purchase heroin and cocaine from Santana’s organization at 3 Gavin Way in South Boston. Between January and March 2013, UC continued purchasing small quantities of heroin from Santana and his organization at 3 Gavin Way, Apt. 545, South Boston, Massachusetts.
On March 26, 2013, law enforcement applied for and obtained a warrant to record telephonic and in-person conversations that UC had with Santana and other co-conspirators. See Commonwealth v. Blood, 400 Mass. 61 (1987). The warrant expired on April 9, 2013. During the period of this Blood warrant, UC purchased heroin from Santana and/or Fardegris Pena (“Pena”) on March 28, 2013 and April 4 and 9, 2013 in the area of Andrew Square and at 3 Gavin Way, Apt. 545, South Boston. During these purchases, Santana and/or Pena were nervous, conscious of the possibility of surveillance, and on one occasion searched UC’s bag and body for a recording device.
On May 2, 2013, the police sought and obtained another Blood warrant to record telephonic and in-person conversations that UC had with Santana and other co-conspirators.
On May 3, 2013, UC made contact with Santana and was directed to 3 Gavin Way, Apt. 545, South Boston to purchase heroin. When he arrived, UC met two other purchasers who were waiting to buy drugs as well. During this time, surveillance officers observed Pena driving around in the vicinity conducting counter-surveillance. When UC was ultimately allowed into 3 Gavin Way, Apt. 545, an unidentified Hispanic male locked the door behind UC, attempted to have UC ingest some of the heroin as a test, and searched UC for recording equipment. Surveillance officers observed Pena continuing to conduct counter-surveillance in the area.
As a result of the incident on May 3, 2013, it appears law enforcement decided to discontinue the use of UC to conduct undercover purchases from Santana and his drug distribution organization. The police continued to conduct surveillance on the various residences that had been identified over the course of the investigation.
On May 6, 2013, surveillance officers observed Santana and another Hispanic male, later identified as Granearlo Melo (“Melo”), exit 49 Old Morton St. and travel via a livery car to 3 Gavin Way. Thereafter, Santana and Melo traveled to the vicinity of 52 Deering Rd., Mattapan, MA (“52 Deering Rd.”), where they got out of the livery car, retrieved items from the livery car’s trunk, and entered 52 Deering Rd with keys to that location. Law enforcement also observed a Volkswagen Passat (“the Passat”), previously used by Pena, parked in the vicinity of 52 Deering Rd. (Before applying for the search warrant, the police reasonably came to believe that the second-floor unit at 52 Deering Rd. was being used as a “stash house” for Santana and the others distributing drugs with him.) Shortly after entering 52 Deering Rd., Santana and Melo exited, wearing different clothing, entered the Passat and drove away. Law enforcement kept the vehicle under surveillance. About an hour later, UC was able to observe Melo and identified him as the same person who had searched him and attempted to force him to ingest heroin on May 3, 2013.
Within 30 days of applying for the search warrant, the police arranged for a person (“CS1”) to purchase heroin from Pena. Pena had the transaction occur inside the Passat. After the transaction, the police observed Pena driving the Passat to conduct counter-surveillance. Surveillance units later saw the Passat parked near 52 Deering Rd.
On May 21, 2013, law enforcement surveillance officers observed Pena leave 52 Deering Rd., enter the Passat and drive to an area near Old Morton Street where she parked. They observed a Hispanic male approach the Passat and then walk to 49 Old Morton St. During this surveillance, law enforcement observed a black male sitting on a porch across the street from 49 Old Morton St. This black male had sold heroin to UC on December 15, 2012 at the premises.
Within three weeks of applying for the search warrant, CS1 arranged with Pena to buy heroin. When CS1 went to the designated location, CS1 was met by, and received heroin from, a Hispanic male. This was the same Hispanic male who had approached Pena’s Passat in the vicinity of 49 Old Morton St. on May 21, 2013 and who had been present during some of UC’s purchases of heroin at the premises. After this transaction with CS1, law enforcement followed the Hispanic male back to 49 Old Morton St.
Within two weeks of applying for the search warrant, CS1 arranged with Pena to purchase heroin. Pena, driving the Passat, met CS1 and sold CS1 the heroin. After the transaction, law enforcement followed Pena to 52 Deering Rd.
On June 6, 2013, surveillance units observed Santana in front of 49 Old Morton St. Three days later, surveillance units observed Santana in front of 49 Old Morton St. in the Passat.
*208 Within 10 days of applying for the search warrant, CS1 called Pena in an attempt to purchase heroin. An unknown Hispanic male answered the telephone and agreed to meet CS1 in the area of the Ashmont MBTA train station in Dorchester. Shortly thereafter, surveillance units observed an unidentified Hispanic male exit 49 Old Morton St and get into a white Land Rover. Also parked at 49 Old Morton St. was the Passat. The Hispanic male was followed to the meeting location where he sold CS1 heroin, before he turned around and returned to 49 Old Morton St. He exited the vehicle and entered 49 Old Morton St.
On June 14, 2013, surveillance units observed Pena make a number of stops in towns south of Boston, consistent with a person engaged in delivering unlawful drugs.
Within 72 hours of applying for the search warrant, CS1 called Pena in an effort to purchase heroin. Pena met CS1 in the Passat and sold CS1 heroin.
These facts, and others included in the search warrant affidavit, make clear that there was probable cause to believe that evidence of Santana’s drug dealing operation would be found at, or during a search of, the premises. The search warrant affidavit reflected a long-term, complicated operation to distribute heroin, among other drugs, and to do so out of and by utilizing multiple locations. Although the undercover officer’s purchases of heroin and cocaine from the premises stopped in early March 2013, the apparent use of the premises for distribution of heroin continued into June 2013. See, e.g., Commonwealth v. Matias, 440 Mass. at 792-93; Commonwealth v. Alvarez, 422 Mass. 198, 205 (1996); Commonwealth v. Rice, 47 Mass.App.Ct. 586, 590 (1999) (“Where conduct is shown to be continuing, [ ] the passage of time becomes less important and staleness may be overcome”). The evidence of a continuing and protracted course of drug dealing by Santana and others associated with him, and their continued use of the premises, overcame the staleness of any information about sales to UC directly from the premises.
II. The Motion to Dismiss
In her motion to dismiss, defendant argues under McCarthy that the evidence presented to the grand juiy in support of the charge of reckless endangerment of a child, G.L.c. 265, §13L, was insufficient to establish probable cause to believe defendant had committed that offense. Such a motion turns on a review of the grand juiy transcripts, a copy of which is attached to the Commonwealth’s Opposition to the Defendant’s Motion to Dismiss (Docket #22), and need not be set out or summarized herein in full.
A. The McCarthy Standard
In Commonwealth v. McCarthy, 385 Mass. 160 (1982), the Supreme Judicial Court carved out an exception to the general rule that a “court will not inquire into the competency or sufficiency of the evidence before the grand jury.” Commonwealth v. Robinson, 373 Mass. 591, 592 (1977) (quotation omitted). See also Commonwealth v. Walczak, 463 Mass. 808, 845-46 (2012) (Spina, J., concurring in part and dissenting in part). The Court held that “at the veiy least the grand jury must hear sufficient evidence to establish the identity of the accused ... and probable cause to arrest him” for the crime charged; otherwise, the indictment should be dismissed. McCarthy, 385 Mass. at 163 (citations omitted).
“Probable cause to sustain an indictment is a decidedly low standard.” Commonwealth v. Hanright, 466 Mass. 303, 311 (2013), citing Commonwealth v. Moran, 453 Mass. 880, 883-84 (2009), and Commonwealth v. Hason, 387 Mass. 169, 174 (1982). The grand jury must hear evidence on each element of the charged crime, or the indictment cannot stand. Moran, 453 Mass. at 884. The probable cause standard applicable to an indictment is the same as the probable cause standard applicable to arrest, requiring “more than mere suspicion but something less than evidence sufficient to warrant a conviction.” Commonwealth v. Roman, 414 Mass. 642, 643 (1993), quoting Hason, 387 Mass. at 174. Specifically, the evidence presented to the grand jury must consist of “reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense.” Hanright, 466 Mass. at 311-12, quoting Commonwealth v. Stevens, 362 Mass. 24, 26 (1972). These considerations “are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.” Walczak, 463 Mass. at 848 (Spina, J.), quoting Brinegar v. United States, 338 U.S. 160, 175 (1949). Finally, the probable cause standard is “substantially” lower than that required to avoid a directed verdict at trial. Commonwealth v. Perkins, 464 Mass. 92, 101 & n.18 (2013).
B. Reckless Endangerment of a Child
The elements of the offense provide the yardstick against which to measure the facts presented to the grand juiy. The statute prohibiting reckless endangerment of a child was enacted in 2002. It provides:
Whoever wantonly or recklessly engages in conduct that creates a substantial risk of serious bodily injury or sexual abuse to a child, or wantonly or recklessly fails to take reasonable steps to alleviate such risk where there is a duty to act shall be punished by imprisonment in the house of the correction for not more than two and one half years.
G.L.c. 265, §13L. The offense requires proof of the following elements: (1) “a substantial risk of serious bodily injury or sexual abuse,” (2) that the “substantial risk” is to a “child,” and (3) that defendant “wantonly or recklessly” either (a) “creates [the] substantial risk,” or (b) “fails to take reasonable steps to alleviate [the] *209 risk where there is a duty to act.” Id. See Commonwealth v. Roderiques, 462 Mass. 415, 422 (2012).
Two of these elements can be addressed briefly. First, the statute defines a “(c)hild” as “any person under 18 years of age.” G.L.c. 265, §13L. The grand jury heard testimony that defendant’s two children were around seven to ten years old; plainly meeting the statutory definition.
Second, the statute defines “wanton or reckless behavior” as occurring “when a person is aware of and consciously disregards a substantial and unjustifiable risk that his acts, or omissions where there is a duty to act, would result in serious bodily injury or sexual abuse to a child. The risk must be of such nature and degree that disregard of the risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.” Id. This definition is somewhat circular, defining “wanton and reckless behavior” by the substantiality and nature of the risk posed by defendant’s actions or omissions.
The grand jury heard testimony that defendant is the mother of the children in question. She has a duty to act to alleviate substantial risks of bodily harm to her children, or at least the grand jury could have so found. Moreover, the grand jury heard testimony that defendant was involved with, and knew about, the distribution of heroin from the premises, where she and the children lived. Consequently, if such distribution created a “substantial risk” of “serious bodily injury or sexual abuse,” the grand jury could have found that she either created or contributed to the “substantial risk,” or knew of and failed to alleviate the “substantial risk” despite a duly to do so. See, e.g., Commonwealth v. Roderiques, 462 Mass. at 423-24; Commonwealth v. Figueroa, 83 Mass.App.Ct. 251, 259-60 (2013).
As explained at argument, defendant’s principal challenge here is to the quantum of evidence presented to the grand jury on the first element. She contends the grand jury did not hear sufficient evidence to establish probable cause that there existed a “substantial risk” that her children would suffer “serious bodily injury or sexual abuse.”
Although the statute does not define “substantial risk,” a plain reading of the statute makes clear that “substantial” describes the likelihood that serious harm will occur. The word “substantial,” which qualifies “risk,” could be read in two ways: as characterizing the magnitude of the potential harm associated with the risk, or as characterizing the likelihood or probability that the “risk” will actually occur. Independent of the word “substantial,” the statute already requires the potential harm to involve “serious bodily injury or sexual abuse,” with the phrases “serious bodily injury” and “sexual abuse” separately defined in the statute. “Serious bodily injury” is defined as “permanent disfigurement, protracted loss or impairment of a bodily function, limb or organ, or substantial risk of death.” See Commonwealth v. Hendricks, 452 Mass. 97, 103 (2008), quoting G.L.c. 265, §13L. Against this definition, the word “substantial” modifying “risk,” adds nothing to the definition of “serious bodily injury” if it were meant to characterize the magnitude of the harm.[3] See also Hendricks, 452 Mass. at 103 (“the harm at risk must be of a very serious nature”). The better reading of the phrase “substantial risk” in the context of G.L.c. 265, §13L is that “substantial” describes the probability or likelihood that “serious bodily injury” or “sexual abuse,” as those phrases are defined in the statute, will actually occur. The mere fact that there is some risk is insufficient. Instead, the statute requires the probability or “risk” that “serious bodily injury” or “sexual abuse” will occur to be “substantial.”
Although somewhat conflating the elements of “substantial risk” and “wanton[ ] or reckless! 1” conduct, the Supreme Judicial Court has stated that the statute requires that “the risk must be a good deal more than a possibility, and its disregard substantially more than negligence.” Hendricks, 452 Mass. at 103. See also Commonwealth v. Levesque, 436 Mass. 443, 451-52 (2002) (wanton and reckless conduct is intentional conduct that involves “a high degree of likelihood that substantial harm will result to another” (emphasis added), quoting Commonwealth v. Welansky, 316 Mass. 383, 399 (1944)).
The grand jury heard testimony in this case about the unfortunate, but all-too-frequent, scenario of a person selling drugs out of a home in which children reside.[4] As it relates to the reckless endangerment charge, the grand jury heard testimony to the effect that there were many small sales of heroin and cocaine occurring out of 49 Old Morton St., Apt. #2; that the children lived there and were present on a number of occasions when UC purchased heroin; that Santana or others working with him had set up video surveillance so that from inside the unit they could observe who was approaching the outside of 49 Old Morton St.; twice one of the children went to the front door of 49 Old Morton St. to allow UC to enter the apartment; and once UC saw the children in the apartment while heroin was actively being packaged by adults.
Notably absent from the testimony before the grand jury was any reference to a firearm or other dangerous weapon possessed by Santana or anyone working for him, seen at 49 Old Morton St., or recovered during the search of the premises. There was no testimony about any violence occurring in or around the vicinity of 49 Old Morton St. There also was no testimony about Santana or other adults at the residence leaving drugs unattended, or leaving them in a location where they could be reached or ingested by a curious child.
*210 Instead of hearing testimony about actual harm, or immediate risks posed to defendant’s children based on the specific conduct or conditions at 49 Old Morton St., the grand jury only heard testimony from Boston Police Det. Juan Seoane to the effect that a person who ingests even one bag of heroin could overdose and die (and the implicit suggestion that this could happen to the children);[5] and that drug dealers who sell drugs from a place where drugs are present face the possibilily of a robbery, with the possibility that the drug dealer, family members, or others present at the property could be tied up, grabbed, threatened with torture, or raped. Det. Seoane did nothing to quantify the risk of such incidents except to testify that such things have happened in the Boston area “within the last two or three years.”[6] Such testimony could be proffered in any case in which a defendant is selling drugs out of a property where a child lived or visited. It is neither particularized to this situation, nor does it meaningfully attempt to quantify the likelihood or probability that an incident like one described by Det. Seoane would occur.
The Commonwealth’s attempt to apply the reckless endangerment statute in this case takes it well beyond any application I have been able to find. See, e.g., Hendricks, 452 Mass, at 103 (defendant embarking on high-speed chase to elude police at night on unpaved roads with sharp turns, driving over an embankment and fleeing into the woods on foot with three-year-old child); Commonwealth v. Marcangelo, 83 Mass.App.Ct. 1121, 2013 WL 1222439 at **1-2 (Mar. 27, 2013) (Rule 1:28 opinion) (defendant running red light, driving wrong way down one-way street, and driving on sidewalk during snowy conditions with child); Commonwealth v. St. John, 82 Mass.App.Ct. 1101, 2012 WL 2159259 at *1 (Jun. 15, 2012) (Rule 1:28 opinion) (defendant pouring hot oil over sleeping victim and child in bed). See also Commonwealth v. Paul, 82 Mass.App.Ct. 1109, 2012 WL 3154545 at *3 (Aug. 6, 2012) (Rule 1:28 opinion) (overwhelming marijuana fumes may have caused police officer to be concerned about physical harm to young child). Permitting the reckless endangerment charge to go forward on this grand jury showing would ignore the statutory element that the “risk” of “serious bodily injury” be “substantial.”
The reckless engagement statute, G.L.c. 265, §13L, does not criminalize foolish, reckless, or negligent parenting. It does not criminalize neglect of a child or extraordinarily poor role modeling. It does not even criminalize the use of a child to aid in the distribution of drugs. All such acts pose risks of harm to children, many of them potentially lifelong. Nonetheless, it is hardly self-evident that a person who sells drugs out of her house is likely to be robbed, and, if robbed, that her children will be physically or sexually harmed during the robbery. Where, as here, the actions of a parent create (or fail to alleviate) a risk of harm to a child and the probability or likelihood of the harm is not self-evident,[7] the grand jury must hear evidence that the likelihood or probability — that is, the “risk”— of such “serious bodily injury” is in fact “substantial.” The grand jury was presented with no evidence on this element of the statute.
ORDER
Defendant’s Motion to Suppress (Docket #17) is DENIED.
Defendant’s Motion to Dismiss Indictment No. 5 (Docket #20) is ALLOWED.

The Commonwealth’s opposition was filed in connection with the case against Fardegris Pena (SUCR2013-10830), Abdiel Pizzarro (SUCR2013-10832) and this defendant.

Despite Santana’s perception that the premises were “hot,” he did not discontinue use of the premises for drug distribution and later sold heroin to UC on March 6, 2013.

“Sexual abuse” is defined to mean indecent assault and battery on a child under or over 14, rape, rape of a child under 16 with force, rape and abuse of a child, and assault with intent to commit rape, each as defined in various specified provisions of G.L.c. 265. Itis difficult to see what “substantial” would add as a qualifier for the magnitude of the harm caused by these specified criminal acts.

The grand jury heard testimony about the long-term investigation into the drug dealing operations of Santana and those working with him. Although not set out precisely in the same manner, the description of the investigation set forth above, see, supra, at 4-8, is not an unfair summaiy of the information presented to the grand jury.

Grand Jury Transcript (Aug. 26, 2013) at 6-7. Similar consequences could, of course, befall a child who ingested any number of routinely kept household cleaning products, solvents, prescribed and over-the-counter medications, and other items. Nothing in the grand jury testimony relating to drug overdoses quantified the frequency with which children are seen to have accessed and ingested drugs sold by a parent.

Grand Jury Transcript (Aug. 26, 2013) at 8. Det. Seoane did testify that robberies “to places like that. . . happen! ] all the time.” Id. at 7. This testimony appears to be an effort to quantify the likelihood that a robbery may occur, not the likelihood that children would be harmed or victimized. Moreover, other than demonstrating temporal frequency, such testimony does not reflect the chance that a robbery would occur in any particular instance. By way of example, it is fair to say that traffic accidents happen all the time, but such a statement says nothing about the likelihood that a person will actually be in an accident in any one year, let alone an accident causing serious bodily injury. The only testimony offered on the question of whether “serious bodily injury” to children was a “substantial” likelihood was the testimony that “[t]hose are all documented incidents that happen[ed] . . . within the last two or three years in the Boston area.” Id. at 8. Such testimony does nothing more than establish a possibility that such an incident might occur.

Where the probability of harm is self-evident (e.g., driving wildly in adverse conditions, or pouring hot oil on a child, see, supra, at 14-15), the grand jury could reasonably infer from the conduct alone that the likelihood of harm was substantial.