SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. DANIEL M. SPAULDING

 
 Docket:
 SJC-13615
 
 
 Dates:
 November 6, 2024 – January 31, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Hampden
 

 
 Keywords:
 Police Officer. Municipal Corporations, Police. State Ethics Commission. Due Process of Law, Vagueness of statute. Constitutional Law, Vagueness of statute. Statute, Construction. Evidence, Intent, Fraud, Value. Intent. Fraud. Value. Words, "Unwarranted privilege," "Fraudulent intent," "Fair market value."
 
 

      Indictment found and returned in the Superior Court Department on March 30, 2018.
     A pretrial motion to dismiss was heard by William J. Ritter, J., and the case was heard by Michael K. Callan, J.
     The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.
     Ashley P. Allen for the defendant.
     Tara L. Johnston, Assistant Attorney General, for the Commonwealth.
     Eve Slattery, Special Assistant Attorney General, for State Ethics Commission, amicus curiae, submitted a brief.
     KAFKER, J.  The defendant, Daniel M. Spaulding, a police captain in the West Springfield police department (WSPD), was found guilty of obtaining an unwarranted privilege with fraudulent intent, in violation of G. L. c. 268A, §§ 23 (b) (2)[1] and 26.  At trial, the Commonwealth proved that the defendant used over $1,000 in money from the WSPD evidence room to pay his home mortgage.  The defendant was sentenced to a one-year term of probation.
     On appeal, the defendant seeks reversal of his conviction on two grounds:  (1) G. L. c. 268A, §§ 23 (b) (2) (ii) and 26, are unconstitutionally vague; and (2) the evidence at trial was insufficient to prove that the defendant acted with the requisite "fraudulent intent" and that the alleged unwarranted privilege had an aggregate "fair market value" of over $1,000 in any twelve-month period.  Many of the defendant's arguments focus on his purported intention to at some point pay back the money he took from the evidence room.  For the reasons discussed infra, we affirm.[2]
     1.  Background.  a.  Facts.  We recite the facts as the trial judge in this jury-waived trial could have found them, reserving certain facts for our discussion of the legal issues.  See Commonwealth v. Escobar, 493 Mass. 694, 696 (2024).
     From early 2011 to October 3, 2016, the defendant served as the captain of the WSPD's detective bureau.  In this role, the defendant was in charge of the WSPD's evidence room and one of only three persons in the WSPD who could access it.  The evidence room consisted of a "main" evidence room, protected by a key lock and alarm system, and an "inner" evidence room with a separate door and key lock.  The inner room held WSPD's narcotics and United States currency evidence, with the money kept in the original evidence bags from the corresponding cases and separated into clear plastic containers by year of seizure.  A fob system, which required authorized entrants to unlock the door by presenting a small electronic device to a sensor, was installed on the main evidence room entrance in June 2016 for additional security.
     In October 2016, the WSPD's chief, Ronald Campurciani, promoted the defendant to the role of administrative captain.  Campurciani decided that this transition was an opportune time to audit the WSPD's evidence room.  To do so, he hired an outside auditor and, due to cost and time constraints, limited the audit to the contents of the inner evidence room.
     In preparation for the audit, Paul Connor -- the defendant's replacement as detective bureau captain -- began a "purge" of money stored in the inner evidence room that, although seized and subject to asset forfeitures in various cases, had not been turned over to the district attorney's office since 2013.  The district attorney's office informed Connor that the WSPD had not produced forfeitures totaling $49,524.50 from forty cases arising between January 9, 2013, and March 24, 2017.
     On March 28, 2017, Connor and WSPD's evidence officer, Paul Poole, began the process of locating and cross-referencing the money in the inner evidence room with the district attorney's office's list of outstanding forfeitures.  Connor and Poole ultimately could not locate money seized in three different cases:  $5,110 seized from a defendant in 2012 (Case A); $3,500 seized from a defendant in 2014 (Case B); and $9,001 seized from a defendant in 2015 (Case C).  At the time, these cases represented three of the five largest money forfeitures in the WSPD evidence room.  Connor and Poole reported the missing money to Campurciani, who contacted the Attorney General's office (AGO).  The AGO then opened a criminal investigation.
     On May 16, 2017, State police troopers assigned to the AGO conducted unannounced interviews of the WSPD officers with evidence room access.  During his interview, the defendant denied taking or having the missing money, asserted that a review of his "financials" would not show "outside cash" going into his bank accounts, and told investigators he believed that the money "would turn up."
     Several days later, on May 19, the defendant texted Campurciani and asked to meet.  When the two met the next morning at the chief's home, the defendant admitted that the money in question was in his possession and not, in fact, missing.  He explained to Campurciani that he believed the three evidence bags containing the missing money "had been compromised" and "thought . . . the best idea was for him to keep the money, secure it so that when the [evidence room] audit did come, he could explain to [the auditor] the circumstances behind the money."  He further claimed that he was keeping the three evidence bags locked in his office.  At the chief's instruction, the defendant returned the three evidence bags, which contained bills totaling the $17,611 of missing evidence money, on the following Monday, May 22, while at work.  Campurciani personally delivered these bags to the AGO's Boston office the next morning.
     Investigators counted and imaged the bills in the three returned evidence bags.  Using the bills' serial numbers, investigators determined the date on which each bill was put into circulation, its so-called "born-on" date.  In total, 136 bills, with a cumulative value of $5,710, were "born" after their respective case's seizure date.[3]  Seventy of these bills, with a cumulative value of $2,880, were "born" in the twelve months prior to the date on which the defendant returned the missing evidence bags, May 22, 2017.[4]  In the same twelve-month period, the defendant and his wife were subject to over $69,500 of credit card debt, minimum monthly credit card payments of over $1,700, a home mortgage, and various loans borrowed from a local credit union, an online lending service, and the couple's retirement funds.
     Investigators were able to match records of the defendant's presence in the WSPD evidence room and access to the relevant digital case files with the dates of cash deposits into, and mortgage payments taken out of, bank accounts associated with the defendant.  For example, on February 16, 2016, the defendant disarmed the WSPD evidence room alarm at 3:52 P.M., left the evidence room and rearmed the alarm at 4:05 P.M., and viewed Case C's information on the WSPD's computer system at 4:13 P.M.  He then deposited $1,620 in cash into a personal bank account at 4:48 P.M. and subsequently made a $3,200.46 mortgage payment from the same account.  Prior to the $1,620 cash deposit, the account did not contain sufficient funds to make such a payment.  This pattern of cash deposits into, and mortgage payments made from, an account that previously held insufficient funds occurred on at least three other occasions that year, including with respect to a $2,900 cash deposit on June 16, 2016.[5]
     b.  Procedural history.  On March 30, 2018, a grand jury indicted the defendant for the offense of knowingly and with fraudulent intent using his official position to secure an unwarranted privilege with an aggregate fair market value of more than $1,000 in a twelve-month period, in violation of G. L. c. 268A, §§ 23 (b) (2) and 26.  The defendant filed a motion to dismiss the indictment on March 6, 2019, for which a nonevidentiary hearing was held on May 22.  The motion judge denied the motion on July 12.
     A six-day jury-waived trial began on July 19, 2021.  On August 2, the defendant filed a motion for a required finding of not guilty.  The trial judge denied the motion and found the defendant guilty that day.  On September 29, the trial judge sentenced the defendant to a one-year term of probation.  The defendant timely filed a notice of appeal.  We transferred the case to this court on our own motion.
     2.  Discussion.  The defendant raises two arguments on appeal:  (1) G. L. c. 268A, §§ 23 (b) (2) (ii) and 26, are unconstitutionally vague as applied to him; and (2) the Commonwealth's evidence was insufficient to convict the defendant of the offense charged.  We address each argument in turn.
     a.  The statute is not void for vagueness either on its face or as applied.  As a preliminary matter, it is far from clear whether the defendant properly preserved a void for vagueness challenge in the instant case.  In a pretrial motion, he claimed that the statute was void for vagueness both on its face and as applied to him.  See Commonwealth v. Moses, 436 Mass. 598, 605 n.4 (2002) ("A void for vagueness challenge is a facial challenge that must be raised in a pretrial motion to dismiss").  He did not, however, renew the motion for a required finding of not guilty, as applied to him, on this ground.  See Commonwealth v. Oakes, 407 Mass. 92, 94-95 (1990) ("Generally, a challenge to the constitutionality of a statute as applied should be preserved in a motion for a required finding of not guilty . . .").  Regardless, we need not belabor the waiver point, as we conclude that the statute is neither void for vagueness on its face nor void for vagueness as applied to the defendant.
     Anchored in the due process guarantees of both the United States Constitution and the Massachusetts Declaration of Rights, the "void for vagueness" doctrine provides that a criminal statute is unenforceable unless it gives "fair notice of proscribed conduct."  Commonwealth v. Spano, 414 Mass. 178, 180 (1993).  See Commonwealth v. Hendricks, 452 Mass. 97, 102 (2008).  A statute is not impermissibly vague if it provides "'a reasonable opportunity for a person of ordinary intelligence' to know that the type of conduct in which [the person] engaged [is] prohibited" (citation omitted).  Id.  See Opinion of the Justices, 378 Mass. 822, 827 (1979) (if statute "conveys a definite warning of proscribed conduct -- when measured by common understanding and practices -- it is constitutionally adequate").
Section 23 (b) (2) (ii) states:
     "No current officer or employee of a . . . municipal agency shall      knowingly, or with reason to know:  . . . use or attempt to use     such official position to secure for such officer, employee or      others unwarranted privileges . . . which are of substantial value      and which are not properly available to similarly situated     individuals."
G. L. c. 268A, § 23 (b) (2) (ii).  Section 26 then criminalizes violations of § 23 (b) (2) (ii) if certain additional requirements are met:
     "Any person who, directly or through another, with fraudulent      intent, violates [§ 23 (b) (2)] . . . shall be punished by a fine of not more than $10,000, or by imprisonment in the state prison     for not more than 5 years, or in a jail or house of correction for   not more than 2 1/2 years, or both, if the unwarranted privileges      or exemptions have a fair market value in the aggregate of more    than $1,000 in any 12 month period."
G. L. c. 268A, § 26.  In arguing that the statute is void for vagueness, the defendant emphasizes that neither "unwarranted privilege" nor "fraudulent intent" is defined in the statute.
     In the absence of statutory definitions, we "give [words] their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose."  Commonwealth v. Zone Book, Inc., 372 Mass. 366, 369 (1977).  Here, the key statutory terms -- "unwarranted privilege" and "fraudulent intent" -- provide a "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."  Commonwealth v. Adams, 389 Mass. 265, 270 (1983).  We also, of course, read these terms together, and not in isolation or out of context, as the defendant seeks to do here.  See Plymouth Retirement Bd. v. Contributory Retirement Appeal Bd., 483 Mass. 600, 605 (2019) ("Even clear statutory language is not read in isolation"); Commonwealth v. Morgan, 476 Mass. 768, 777 (2017) ("The plain language of the statute, read as a whole, provides the primary insight into [the intent of the Legislature]").
     Turning first to "unwarranted privilege," we conclude that the term's plain meaning, read in context, provides sufficient notice of prohibited conduct to a person of reasonable intelligence.  See Webster's Third New International Dictionary 2514 (1968) (defining "unwarranted" as "lacking adequate or official support:  unjustified, unauthorized"); Black's Law Dictionary 1449 (11th ed. 2019) (defining "privilege" as "[a] special legal right, exemption, or immunity granted to a person or class of persons; an exception to a duty").  Consistent with that plain meaning, the State Ethics Commission (Ethics Commission) has correctly interpreted "unwarranted privilege" to include the misuse of the benefits, privileges, or advantages of office for personal gain.  See, e.g., Matter of Hyde, State Ethics Commission, No. 13-0010, at 2547-2548 & nn.15-16 (Dec. 17, 2014) (town fire chief, in violation of § 23 [b] [2] [ii], secured "unwarranted privilege" by directing over $2,000 of town funds to his son using falsified payrolls); Matter of Famolare, State Ethics Commission, No. 11-0015, at 2429-2432 & nn.12-13, 2435 (Aug. 16, 2012) (town harbormaster, in violation of § 23 [b] [2] [ii], secured "unwarranted privilege" from town contractor by obtaining free pier installation on his private property); Matter of Marshall, State Ethics Commission, No. 408, at 509-510 (Feb. 21, 1991) (county sheriff, in violation of § 23 [b] [2], secured "unwarranted privilege" by using office credit card to pay for $4,450.52 of "personal charges").  See also Comtois v. State Ethics Comm'n, 102 Mass. App. Ct. 424, 433-434 (2023) (affirming Superior Court's upholding of Ethics Commission's decision and order regarding § 23 [b] [2] [ii] violation based on this "unwarranted privilege" definition).
     In the instant case, the application of these terms is obvious.  An officer of "ordinary intelligence" would know, or have reason to know, that using money in the evidence room to pay his personal expenses would constitute an unwarranted privilege (citation omitted).  Hendricks, 452 Mass. at 102.  This is true even if the officer intends to pay the money back at some point.
     We also reject the defendant's argument that the meaning of "fraudulent intent" is unconstitutionally vague on its face or as applied to him.  Although we have not previously interpreted "fraudulent intent" in the specific statute at issue, we have done so in other related contexts.  In Commonwealth v. O'Brien, 305 Mass. 393, 397 (1940), in the context of a charge of fraudulent conversion of city property by a city officer in violation of G. L. (Ter. Ed.) c. 266, § 51, we stated that "fraudulent intent" requires "some deceit, concealment or breach of trust."  Likewise, in Commonwealth v. Garrity, 43 Mass. App. Ct. 349, 357 (1997), cert. denied, 524 U.S. 954 (1998), in the context of jury instructions for the crime of fiduciary embezzlement, which includes the element of fraudulent intent, the Appeals Court found no error in the following jury instruction:
     "To act with fraudulent intent in this context means that [the defendant] had the specific intent to gain some undue advantage for    himself or to injure or harm some other person by means of a representation or representations that he knew to be false when he    made them or by an act or acts which he took knowing them to be     wrongful and in violation of an affirmative duty that he had."
See Webster's Third New International Dictionary 904 (1968) (defining "fraud" as "an instance or an act of trickery or deceit esp[ecially] when involving misrepresentation"); id. at 1176 (defining "intent" as "the state of mind or mental attitude with which an act is done").  On its face, then, the fraudulent intent requirement in § 26 is sufficiently clear.  A defendant must act with the specific intent to secure for himself a privilege he knew to be unwarranted and do so by means of trickery, deceit, concealment, or other knowingly wrongful conduct.
     The defendant contends that the statutory requirement of fraudulent intent is unconstitutionally vague with respect to his conduct because he was only "borrowing" the money with the intent to return it at some point.  We disagree.  As explained supra, it is an unwarranted privilege to use money from an evidence room to pay personal expenses, even if there is an intention to return it.  The defendant need not have sought to permanently take the money in order to secure for himself an unwarranted privilege.  Persons of ordinary intelligence would understand that, if they have specific intent to secure for themselves unwarranted privileges, such as using money from the evidence room to pay their personal expenses, and secure such privileges by means of trickery, deceit, concealment, or other knowingly wrongful act, they have demonstrated the necessary fraudulent intent required by § 26.  The statute is not unconstitutionally vague in this regard.  Cf. Commonwealth v. Tuckerman, 10 Gray 173, 203 (1857) (in embezzlement case where defendant claimed that he intended to return money, jury were properly instructed that fraud could be found in "any artifice whereby he who practi[ces] it gains, or attempts to gain, some undue advantage to himself . . . by means of a representation which he knows to be false, or of an act which he knows to be against right or in violation of some positive duty" [emphasis added]); United States v. Hollis, 971 F.2d 1441, 1452 (10th Cir. 1992), cert. denied, 507 U.S. 985 (1993) ("if a defendant knowingly provided materially false information in order to induce the loan, the crime [of bank fraud] is complete, and it is irrelevant whether or not he intended to repay it or was capable of repaying it"); United States v. McKinney, 822 F.2d 946, 949-950 (10th Cir. 1987) (that "defendant later offers repayment . . . does not negate an earlier intent to defraud" under Federal bank fraud statute).
     b.  Sufficiency of the evidence.  The defendant also argues that the Commonwealth failed to prove beyond a reasonable doubt two elements required for a conviction under G. L. c. 268A, § 26:  (1) "fraudulent intent"; and (2) "fair market value" of the alleged unwarranted privilege exceeding $1,000 in a twelve-month period.
     When reviewing the sufficiency of the evidence, we "assess the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt."  Commonwealth v. Robinson, 493 Mass. 303, 307 (2024), citing Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).  "A conviction may rest exclusively on circumstantial evidence, and, in evaluating that evidence, we draw all reasonable inferences in favor of the Commonwealth" (citation omitted).  Commonwealth v. Bonner, 489 Mass. 268, 275 (2022).  The inferences a fact finder may draw from the evidence "need only be reasonable and possible and need not be necessary or inescapable" (quotation omitted).  Commonwealth v. Shakespeare, 493 Mass. 67, 80 (2023).
     i.  Fraudulent intent.  With respect to "fraudulent intent," as the defendant highlights in his appellate brief, the Commonwealth's theory of the case, as stated in its opening statement, was as follows:
     "[A]t no time during this case are we going to do anything to      suggest that [the defendant] ever had an intention to steal that money.  I'd suggest to you that the evidence in this case is quite      the contrary.  The evidence is that this money was borrowed."
Based on the Commonwealth's own limited theory, the defendant contends that "borrowing" the money, with the intent to return it, is insufficient to establish fraudulent intent.  We disagree.
     The evidence overwhelmingly established that the defendant secreted money out of the evidence room on numerous occasions to pay his mortgage, with the specific intention to secure for himself what he undoubtedly knew to be an unwarranted privilege.  When the missing money was discovered, the defendant made objectively false statements regarding his involvement with, and knowledge of, the missing money both to investigators and to the WSPD chief, further demonstrating his attempt to conceal his removal of the money and deceive those trying to locate it.  These statements confirm that the defendant acted to secure an unwarranted privilege with the necessary fraudulent intent.  See Commonwealth v. Braune, 481 Mass. 304, 312 (2019) ("Intent is a factual matter that may be proved by circumstantial evidence" [citation omitted]); Commonwealth v. Walters, 472 Mass. 680, 693 (2015), S.C., 479 Mass. 277 (2018) (same).
     As explained above, the actus reus and mens rea required to satisfy §§ 23 (b) (2) (ii) and 26 are satisfied regardless of whether the defendant returned or intended to return the money.  As for the actus reus, the defendant secured for himself an unwarranted privilege when he took money out of the evidence room to pay his mortgage.  It is, again, an unwarranted privilege to "borrow" money from an evidence room to pay personal expenses -- the money need not be permanently taken for such use to constitute an unwarranted privilege.
     Regarding mens rea, the defendant acted with the necessary fraudulent intent even if he intended to return the money.  There is more than sufficient evidence to conclude that, when he secreted the money from the evidence room to pay his mortgage and later lied to investigators, the defendant acted with the specific intent to secure for himself a privilege he knew or should have known was unwarranted, and did so by means of concealment, trickery, deception, or other knowingly wrongful act demonstrating fraudulent intent.  See G. L. c. 268A, §§ 23 (b) (2) (ii), 26.  Compare Commonwealth v. Mills, 436 Mass. 387, 394 (2002) (crime of larceny requires "specific intent to deprive the person of the property permanently" [citation omitted]).
     ii.  The fair market value of the unwarranted privilege exceeded $1,000.  Finally, we conclude that there was sufficient evidence that the "fair market value" of the defendant's unwarranted privilege exceeded $1,000 in a twelve-month period.  In reaching this conclusion, we adopt a straightforward analysis based on the actual amount the defendant took from the evidence room.
     At trial, the Commonwealth argued that "fair market value" in this context should be based on face value.  The defendant argued that the appropriate value was the "use" of the "borrowed" money.  Following a lengthy discussion after the close of evidence, the trial judge ultimately determined that the "fair market value" of the money's "use" was equivalent to the interest that would have accrued had the defendant taken a legitimate loan for the same amount of money.  We conclude that the face value of the money used, and not the interest that the defendant would have been required to pay on a loan that was never taken, is the correct measure.
     The defendant did not borrow this money from a bank; he took it from the WSPD evidence room and then used it to pay his mortgage.  In this context, the fair market value of the money was the face value of the money the defendant took from the evidence room during the relevant twelve-month period.  That evidence was provided by the seventy replacement bills, totaling $2,880, with "born-on" dates within the twelve months prior to the date on which the defendant returned the missing evidence bags.  All these bills were "born" well after the dates of the seizures of the money in the relevant cases, demonstrating that the defendant removed the actual bills and replaced them with new ones.
     3.  Conclusion.  We conclude that G. L. c. 268A, §§ 23 (b) (2) (ii) and 26, are not unconstitutionally vague either on their face or as applied here.  Further, the Commonwealth's evidence of the defendant's fraudulent intent and the fair market value of the unwarranted privilege at issue were sufficient to support the defendant's conviction.  We therefore affirm the judgment.
So ordered.
footnotes

     [1] Although the indictment does not specifically list G. L. c. 268A, § 23 (b) (2) (ii), the language of the indictment tracks that subsection, and the Commonwealth's case-in-chief centered on it.  For these reasons, this opinion, in concert with both the Commonwealth's and the defendant's appellate briefing, focuses only on this subsection of G. L. c. 268A, § 23 (b) (2).
     [2] We acknowledge the amicus letter in support of the Commonwealth submitted by the State Ethics Commission.
     [3] For example, the money in Case C was seized in 2015, but the bill with the latest "born-on" date in the corresponding evidence bag was a twenty dollar bill "born" on March 13, 2017.  Likewise, the bill with the latest "born-on" date in Case B's 2014 evidence bag was a one hundred dollar bill "born" on June 15, 2016; the bill with the latest "born-on" date in Case A's 2012 evidence bag was a one hundred dollar bill "born" on June 13, 2016.
     [4] May 22, 2017, was the date used by the Commonwealth to measure whether the value of the unwarranted privilege taken by the defendant exceeded $1,000 within "any" twelve-month period, as required by the statute.
     [5] As noted above, May 22, 2017, marked the end of the twelve-month period used to measure whether the value of the unwarranted privilege obtained by the defendant exceeded $1,000.